[No. E053011. Fourth Dist., Div. Two. Mar. 13, 2012.]

MATT CATE as Secretary, etc., et al., Plaintiffs and Respondents, v.
STATE PERSONNEL BOARD, Defendant;
THOMAS NORTON, Real Party in Interest and Appellant.

**COUNSEL**

Rudy E. Jansen and Michelle L. Hoy for Real Party in Interest and Appellant.

Rose E. Mohan and Stephen A. Jennings for Plaintiffs and Respondents.

**OPINION**

**HOLLENHORST, Acting P. J.—**

## I. INTRODUCTION

Real party in interest Thomas Norton appeals from a judgment granting the petition of plaintiffs and respondents, California's Department of Corrections and Rehabilitation (DCR) and Matt Cate, Secretary of the DCR,[1] for writ of administrative mandamus ordering defendant State Personnel Board (SPB) to reinstate Norton's termination. Norton contends substantial evidence supports the SPB's finding that (1) the DCR failed to prove that Norton told an inmate to hang herself, and (2) the SPB did not abuse its discretion by reducing Norton's penalty from termination to a 30-day unpaid suspension. We find no error, and we affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

Norton had been employed as a correctional officer with the department at the California Institution for Women since 1997. For five years before November 2006, he had worked first watch (10:00 p.m. to 6:00 a.m.) on the support care unit (SCU) where mentally ill inmates are housed.

On May 17, 2007, the DCR sent Norton a notice of adverse action stating that he was dismissed from his position as a correctional officer effective May

---

[1] The civil case information statement filed by counsel for appellant lists only "Matt Cate" as plaintiff and respondent. However, it is clear from the opening brief (which does not list Matt Cate) that California's Department of Corrections and Rehabilitation is intended to be included as plaintiff and respondent.

27, 2007. The notice listed 12 separate allegations,[2] including allegation F, as follows: "On or about November 23, 2006, you were negligent by failing to report or respond to a suicidal statement made by Inmate X-10000.[3] Specifically, Inmate X-10000 advised you that she was going to hang herself, you replied 'go ahead,' or go ahead and hang yourself, or words to that effect."

Allegation E stated that "you [(Norton)] were negligent in the performance of your duties and acted in a discourteous manner towards Inmate X-10000. Specifically after Inmate X-10000 advised you that she was 'scared of the dark' and was 'seeing things,' you subsequently refused her repeated requests to turn on her cell light."

Allegation H was that "[b]etween November 24, 2006 and November 28, 2006, you attempted to intimidate a witness in a potential Internal Affairs Investigation. During telephone conversations with Correctional Officer Ryan Campos, you inquired about information that Campos was planning to include in his November 24, 2006, Incident Report, you referred to Campos as a 'snitch' and asked Campos 'Are you a pussy?' or words to that effect."

Allegation I was that "[b]etween November 24, 2006 and December 8, 2006, you acted in a discourteous fashion towards Correctional Officer Ryan Campos. During conversations with [10 other listed] Correctional Officers . . . you disclosed that Campos had cried and/or became emotional following the attempted suicide of Inmate X-1000[0]. During your December 2006 conversation with Correctional Officer Darryl Hernandez, you referred to Campos as a 'rat' and a 'punk,' or words to that effect, relative to Campos having alleged that you engaged in acts of misconduct prior to, during and following the attempted suicide of Inmate X-1000[0], you also claimed that Campos had not been truthful in his reporting of the circumstances surrounding the incident. . . . [Y]ou also claimed that Campos had lied about the incident."

Allegation K stated: "On December 3, 2006, you exercised undue influence over an Internal Affairs Investigation through your documentation and encouragement of other officers, to document unfavorable information relative to Inmate X-10000. You did so in an effort to compile information against Inmate X-10000 to discredit her as a witness. [A correctional officer on duty in the SCU] on December 3, 2007 observed you engaged in suspicious behavior. [He] observed you writing information on inmate X-10000's institutional bed card and transposing information from the Unit Log Book. You

---

[2] After the administrative hearing, several of the allegations were dismissed and are not at issue in this appeal. Those allegations are not set forth herein, and the evidence specifically relating to those allegations is not included in this statement of facts.

[3] Also referred to herein as "Inmate V."

admitted during your interrogation that you made an entry to Inmate X-10000's bed card on December 3, 2006, but dated it November 24, 2006. You also admitted that you made a photocopy of that bed card because you believed the information could be useful should an investigation into Inmate X-10000's suicide attempt be conducted, or words to that effect. On December 3, 2006, while you were in the SCU Officers Station . . . you commented that it 'was important for [the correctional officers] to document all of Inmate X-10000's behavior because she was a problem[']; or words to that effect."

Allegation L stated: "On December 3, 2006, you were away from your post without permission. Specifically, you abandoned your work area of responsibility and reported to the Support Care Unit without approval of a supervisor. You were observed . . . in the Support Care Unit (SCU) on December 3, 2006. Sergeant Frazier asked you what business you had in the SCU. You replied that you came to the unit to retrieve some pain medication from your locker and that you had permission from your work supervisor to be over in the SCU area, or words to that effect. . . . Sergeant Frazier called . . . your designated supervisor for that day[, who] denied that you were given permission to leave you[r] post assignment as a security and escort officer . . . ."

Norton appealed his termination, and a hearing was conducted by Administrative Law Judge Byron Berry.

At the hearing, Correctional Officer Ryan Campos testified that he had been a correctional officer for about six years. In November 2006, he was working the 10:00 p.m. to 6:00 a.m. shift in the SCU with Norton. The SCU has four corridors lined with cells that radiate like an "X" from a central office. Each hour, one of the two correctional officers on duty does a security check of the unit while the other correctional officer observes from the central office. Inmate V. was in the first cell to the right coming from the control booth.

On November 23, 2006, while Campos was in the office, he heard Inmate V. screaming in her cell, and he heard her ask Norton to turn on her lights, but Norton "didn't do it, he was just messing with her." Inmate V. said she had been hearing voices and was scared. Other inmates started yelling for Norton to "just turn the lights on," but Norton refused. After Norton returned to the office, Inmate V. continued to scream. Norton went back to her cell, and Campos heard her say "something of the nature that she was going to kill herself." He heard Norton say, in response, "Go kill yourself, go hang yourself."

When Campos did a hall check about 11:50 that night, he discovered Inmate V. hanging from a bar beneath the top bunk with a torn sheet around her neck. Campos entered her cell and untied the sheet to get her down. She recovered without injury.

Following the incident, Campos was ordered to write a report. Norton asked Campos three times what Campos was going to write and also asked Campos for a copy of the report. Campos testified that during the night of November 27 and 28, 2006, Norton telephoned him and said he knew Campos had told, and that he was a snitch. In another telephone conversation, Norton called Campos a "pussy" and a "snitch" and asked if Campos was scared. Campos prepared three written reports; however, he did not state in any of them that Inmate V. had said she was going to kill herself or that Norton had responded that she should go ahead. The first time Campos reported that conversation was in an interview in January 2007 with internal affairs. Campos stated he did not disclose the conversation in his reports because the reports were seen by others, and he did not "want to let [him]self out there to be ostracized by [his] peers." He did not document Norton's calling him a snitch and a pussy because he feared retaliation, but he did immediately report the matter to his lieutenant.

In his memorandum report of November 29, 2006, Campos informed his supervisor of the "actions of [Norton] that played a significant role" in Inmate V.'s attempted suicide. The report stated that Norton had been conducting a security check while Campos was in the central office. Campos could see Norton in front of Inmate V.'s cell talking to her in a loud voice. Campos stated: "I could hear [Inmate V.] screaming that she wanted her light left on because she was delusional and was scared of the dark. Officer Norton then walked away to the office and [Inmate V.] began to kick on the door and kept on screaming. This lasted for approximat[ely] 10 minutes until[] Officer Norton walked back to [her cell] and started yelling at [Inmate V.] to 'shut up and go to sleep.' At this time the whole East Hall started to kick their doors and started yelling 'Just turn on her light,' and 'stop messing with her Norton.' At this time I walked towards Officer Norton and asked him if he wanted me to step in, and he replied, 'No, I got it.' So I returned to the office while Norton was still in front of [Inmate V.'s cell] yelling at [Inmate V.] to stop kicking and screaming. Officer Norton again returned to the office and said if [Inmate V.] did not stop kicking and screaming in about 10 minutes I could step in. Inmate [V.] stopped before the 10 minute time period. The whole time in the office[,] Officer Norton was laughing about the whole scenario. . . ."

Campos was on the telephone when Norton was doing the hall check, but Campos could hear what the inmates and Norton were saying. Campos

testified that he told Sergeant Martinez and Lieutenant Brooks about Norton's conduct toward Inmate V. that night.

Correctional Officer Francisco Villegas shared first watch in SCU with Norton and Campos; he worked with Norton two days a week and with Campos two days a week. Counsel for the DCR questioned Villegas about a conversation with Norton on November 26: "Did Norton discuss how [Inmate V.] was acting that night?" Villegas responded, "I remember him saying that, that she wanted the light on or off. I don't remember." Counsel for the DCR asked Villegas to read a report and then asked if it refreshed his recollection of the conversation. Villegas replied, "A bit, sure." He testified that Norton had told him Inmate V. said she was going to hang herself, and Norton had "jokingly said go ahead." Villegas was further questioned about whether he had had a conversation with Campos about the events of that night; however, Villegas did not remember if Campos ever told him Inmate V. said she was going to hang herself or that Norton said to go ahead and do so. Norton told him Campos had been nervous and shaken up by the incident. Villegas did not remember having a conversation with Campos about the incident, but he refreshed his recollection by reading a report. He then testified that Campos had gone into detail about his version of what happened that night; however, Villegas did not recall whether Campos told him what Norton had said to Inmate V. He remembered Campos saying he had been on the telephone when he started hearing the inmates yell, but he did not remember Campos ever saying that Inmate V. had said she was going to hang herself.

Sergeant Frank Martinez, Norton's supervisor the night of the incident, stated that he responded to the scene after the suicide attempt was reported, and he determined that Inmate V. was alive and breathing. Campos, who seemed nervous and upset, asked to talk to him. They went outside, and Campos started crying and said in a "jumbled" fashion that "he made her do it, I can't work with him, he made her do it." When Martinez talked with Norton, Norton appeared to be more concerned about what Campos had said than about the incident itself. Norton later asked Martinez what Campos had written in his report.

Lieutenant Barbara Brooks testified that Norton was on her staff the night of the incident. She responded to the scene upon hearing of Inmate V.'s suicide attempt, and Norton told her "it was just an attempt to get attention, [and] that [Inmate V.] really wasn't serious."

Correctional Officer Darryl Hernandez testified that Norton had told him Campos was making allegations that Norton had provoked or agitated an inmate who was suicidal and Norton had previous personality conflicts with Campos. Norton denied encouraging the inmate to hurt herself.

Correctional Sergeant John Frazier testified that he had seen Norton in the SCU on December 3, 2006, and he knew Norton was not then assigned to that area. Norton was sitting down in the officers' station and writing something in a log book in which the staff recorded pertinent information relating to the watch. It was not appropriate for Norton to be making an entry in the log book because he had been reassigned to another unit. Frazier also saw Norton photocopying an inmate bed behavior card. Frazier examined the card and saw that Norton had made a backdated entry about Inmate V.'s mental health and referred to her suicide attempt as "bogus." Norton told the sergeant he had permission from his supervisor to be in the SCU. He said he had come to the SCU to get a pain pill out of a locker. Frazier called Norton's supervisor and learned that the supervisor had not given Norton permission to be in the SCU.

Correctional Officer Marco Arana-Serrano testified that someone in the officers' station could not hear another officer and an inmate talking down the hall.

Correctional Sergeant Cameron Lane testified that he was Norton's supervisor on December 3, 2006. He did not give Norton permission to go into the SCU that day. Norton had been administratively reassigned out of his post in the SCU.

Norton was called to testify by the DCR and also testified in his own behalf. He testified that on November 23, 2006, he had done his cell check when his shift began at 10:00 p.m. He flashed his light into Inmate V.'s cell, and when he walked past her door, she began to kick or pound on the door to get his attention and call him back. She asked him to turn on her light, and he told her the light had been off when he arrived, and he felt it should stay off. He returned to the officers' station, and after a few minutes, she began to bang on her door again. He went to her cell, and she again asked him to turn on the light. He told her he thought she would sleep better throughout the night if the light stayed off, and he returned to his office. Inmate V. banged on her door intermittently for a few minutes, and Norton returned to her cell. He again explained why he thought it would be better if the light were kept off. He asked her if she would agree to keep it off for an hour, and she agreed. He went back to the office, and a short time later, she again began to bang on the door. He again went to her cell with Campos following about 20 feet behind. Inmate V. said she was afraid of the dark, and Norton turned her light on briefly to show her there was nothing to be afraid of. Norton and Campos returned to his office, and Norton said they would give her another 20 minutes and see how it went. Inmate V. banged the door intermittently during that time, but eventually stopped. Norton peeked into her cell and saw her lying down. He checked again 10 minutes later, and she appeared to be asleep.

About an hour later, he heard Campos say, "we have a hanger, we have a hanger." They both went to Inmate V.'s cell, and he saw Inmate V. lying on her back on the lower bunk, fully supported on the mattress, but with a torn sheet wrapped around her neck. He did not see any knot or noose, and the sheet was not taut but was draped over the bar above. He called to her to take the sheet off her neck, and she turned to him with a sort of smirk. She was breathing, and her color was normal, although she did not comply with his verbal commands. She had never given any indication she wanted to commit suicide, and he had never said to go ahead. Campos entered the cell and removed the sheet from her neck without using any tools. By the time emergency personnel arrived, Inmate V. was sitting up and breathing normally, and her color was good.

Norton denied ever referring to Campos as a snitch, a pussy, a rat, or a punk, and he denied ever trying to intimidate Campos into writing his report differently. Norton claimed he had gone to the SCU on December 3, 2006, to get pain medication from his locker because he had a headache. After he was assigned out of the SCU, he asked if he was precluded from going there, and he was told he was not. He stated that before going to the SCU, he had "poked [his] head" into an office where two sergeants and two lieutenants were and let them know where he was going. He went to his locker and found that his pill bottle was empty. He then went to the staff office and had a conversation with the officers there, including Arana-Serrano. The officers shared their experiences with Inmate V., and Norton learned from Arana-Serrano about Inmate V.'s bed card; Arana-Serrano pulled out the bed card, and Norton made an entry on it.

Norton testified that when he had worked in the SCU, the inmates were usually asleep, and he had not had "a whole lot of dealings" with Inmate V. He also testified that he had known Inmate V. for a few months before the incident. When asked if he knew she had a problem with hallucinations, he responded that he had "no concrete knowledge of her medical history," although he knew every inmate in the unit had mental problems. However, when questioned by the DCR's attorney, he testified he did not turn on her light "[b]ecause my experience with this particular inmate is that she has a better, more non-eventful evening of rest if the light is off. And then my experience is that with the light off that she sleeps better. And then when the light is on, she has these hallucinations and other issues." When questioned by his own attorney, he recalled Inmate V. saying she was afraid of the dark, but he did not recall her saying she was seeing things. However, when questioned by the DCR's attorney, Norton testified that Inmate V. had told him she was scared of the dark and she was "seeing things." Norton denied laughing about the incident.

Norton did not recall any other inmates asking him to turn on Inmate V.'s light. He conceded that a "ruckus" had been created by his not turning on the light, but he disagreed that the other inmates had made any "specific statements," such as "Norton, turn that light on for her." Turning on her light would not have disturbed other inmates.

Norton and Campos had worked together for two or three months before Inmate V.'s suicide attempt. They had ongoing problems—Norton testified that Campos was always chatting on the telephone in the office, and Norton described an incident in which he believed Campos's actions had created an officer safety situation. Norton had never made a complaint about Campos and never asked to be reassigned so as not to work with him. Norton testified he thought he had a good relationship with Villegas.

In the days after the incident, information circulated through the grapevine about what had happened. Norton believed some of the accounts were inaccurate, so he retold "from [his] perspective what [he] observed and what [he] saw happened."

Judge Berry retired without issuing a decision, and the case was reassigned to Administrative Law Judge Kymberly M. Pipkin for a proposed decision based on the record. Judge Pipkin found the following misconduct based on her review of the record: "[Norton's] refusal to turn on Inmate V.'s light was not because he thought she would sleep better; it was a show of power. Calling Campos a 'pussy' because he cried after discovering Inmate V.'s suicide attempt was pure and simple ridicule, and accusing Campos of lying in his reporting of the incident was inaccurate. If [Norton] believed that Campos was spreading rumors about him, he had other, more positive recourses to follow rather than contribute to the gossip mill: take it up directly with Campos, and/or report the matter to management. [Norton's] attitude needs improvement. [¶] [Norton] left his post to return to the SCU and document his version of Inmate V.'s suicide attempt on her bed card. The gravamen here is that he lied about having the permission of his supervisor to come to SCU."

Based on her review of the record, Judge Pipkin made the following findings concerning credibility of witnesses: "The poisonous atmosphere created by the rumor mill made it difficult to know whether witnesses could actually distinguish what they heard from [Norton] as opposed to what they heard from Campos and others. The most damaging allegation about what [Norton] told others was that he told Villegas that Inmate V. said she was going to hang herself, and that he jokingly told her to go ahead. Villegas's recall was very spotty, however. He did not recall the exchange about suicide until asked to read a portion of the investigator's report. Campos had also

discussed the incident with Villegas, but he could· not remember what Campos had said, either. The possibility that Villegas confabulated the conversations is a distinct possibility, rendering his testimony too unreliable to support a finding of fact." Judge Pipkin found that the DCR had failed to meet its burden of proof as to allegation F and dismissed that allegation.

Judge Pipkin summarized her conclusions: "[Norton] refused to turn on a light for an inmate despite her repeated requests, called his former partner names, and told other officers that his former partner had lied on his report. He returned to the unit after being administratively redirected and lied that he had the permission of his supervisor to do so. His actions constituted inexcusable neglect of duty, dishonesty, discourteous treatment and a failure of good behavior, in violation of Government Code section 19572, subdivisions (d), (f), (m), and (t)." Judge Pipkin nonetheless reduced the penalty for Norton's misconduct from termination to a 30-day suspension, and the SPB adopted her decision.

The DCR filed a petition in the superior court for a writ of administrative mandamus under Code of Civil Procedure section 1094.5. Following a hearing, the court granted the petition, explaining, "One, there's insufficient credible evidence to support the administrative law judge finding that allegation F was not supported by substantial evidence. The facts that the only independent witness, Officer Villegas, had to refresh his recollection by review[ing] the Internal Affairs report, which several other witnesses did as well, does [not] mean that his testimony is unreliable.[4] [¶] Furthermore, it was pure speculation for the administrative law judge to discount Officer Villegas'[s] testimony on the mere possibility he might have been confused. [¶] Two, even though the administrative law judge made a finding of dishonesty under allegation L, the Court cannot say that the administrative law judge abused her discretion by reducing the real party in interest's penalty from a dismissal to a 30-day suspension. [¶] However, three, having failed to consider the extent to which the real party [in interest's] conduct resulted in or if repeated is likely to result in harm to the public service under Skelly versus State Personnel Board, the administrative law judge did abuse her discretion in reducing the real party in interest's penalty from dismissal to 30-day suspension." The trial court entered judgment granting the petition.

## III. DISCUSSION

### A. *Appealability*

The DCR argues the trial court remanded the matter for further administrative proceedings, and such an order is not appealable. (E.g., *Village Trailer*

---

[4] While the reporter's transcript omits the word "not," the context makes clear that the trial court intended to include that word.

*Park, Inc. v. Santa Monica Rent Control Bd.* (2002) 101 Cal.App.4th 1133, 1138–1149 [124 Cal.Rptr.2d 857] [a remand order to an administrative agency is not appealable, but the court has discretion to treat the appeal as a petition for writ of mandate].)

Here, in announcing its tentative decision at the hearing, the trial court indicated it was going to order the SPB to set aside the dismissal of allegation F, to set aside the penalty determination, and to reconsider the case. However, the trial court ultimately entered judgment, stating merely that the petition for writ of administrative mandamus was granted. The prayer in the petition requested that the writ be "directed to the Board, compelling it to set aside its decision . . . and reinstate the penalty of dismissal." The judgment contemplates no further administrative proceedings, and the cases on which the DCR relies are therefore inapposite. We conclude the judgment is appealable.

### B. *Substantial Evidence to Support the SPB's Finding*

Norton contends substantial evidence supported the SPB's finding that the DCR failed to prove he told an inmate to hang herself.

#### 1. *Standard of Review*

"Review of disciplinary action by an appointing authority is directed in the first instance to the [State Personnel] Board. The Board acts as an adjudicatory body, weighing the evidence to determine the facts and exercising discretion to ascertain whether the charges sustained are sufficient for the discipline imposed. [Citation.]" (*Gonzalez v. State Personnel Bd.* (1995) 33 Cal.App.4th 422, 428 [39 Cal.Rptr.2d 282].)

The trial court reviews decisions of the SPB for substantial evidence, considering " ' "all relevant evidence in the administrative record including evidence that fairly detracts from the evidence supporting the agency's decision." [Citations.]' [Citation.]" (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 585 [128 Cal.Rptr.2d 514].) In doing so, the trial court's task necessarily "involves some weighing of the evidence to fairly estimate its worth." (*County of San Diego v. Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 555 [195 Cal.Rptr. 895].) In addition, Government Code section 11425.50 provides a specific method for court review of the administrative agency's determination of credibility: "If the factual basis for [an administrative agency's decision] includes a determination based substantially on the credibility of a witness, the statement [of the factual basis for the decision] shall identify any specific evidence of the observed demeanor, manner, or attitude of the witness that supports the determination, and on judicial review the court shall give great weight to

the determination to the extent the determination identifies the observed demeanor, manner, or attitude of the witness that supports it." (Gov. Code, § 11425.50, subd. (b).) The 1995 Law Revision Commission comments to Government Code section 11425.50 state: "Subdivision (b) adopts the rule of *Universal Camera Corp. v. NLRB*, 340 U.S. 474 [95 L.Ed. 456, 71 S.Ct. 456] (1951), requiring that the reviewing court weigh more heavily findings by the trier of fact (the presiding officer in an administrative adjudication) based on observation of witnesses than findings based on other evidence. . . . [¶] Findings based substantially on credibility of a witness must be identified by the presiding officer in the decision made in the adjudicative proceeding. . . . However, the presiding officer's identification of such findings is not binding on the agency or the courts, which may make their own determinations whether a particular finding is based substantially on credibility of a witness. Even though the presiding officer's determination is based substantially on credibility of a witness, the determination is entitled to great weight only to the extent the determination derives from the presiding officer's observation of the demeanor, manner, or attitude of the witness. Nothing in subdivision (b) precludes the agency head or court from overturning a credibility determination of the presiding officer, after giving the observational elements of the credibility determination great weight, whether on the basis of nonobservational elements of credibility or otherwise. . . ." (Cal. Law Revision Com. com., Deering's Ann. Gov. Code (2010 ed.) foll. § 11425.50, p. 139.) Government Code section 11425.50 applies to SPB adjudications of public employee disciplinary proceedings. (*California Youth Authority v. State Personnel Bd., supra*, 104 Cal.App.4th at pp. 590, 592 (*California Youth Authority*).) Thus, when the hearing officer refers to a witness's testimony as credible without identifying any evidence of demeanor, manner, or attitude that supports such determination, the court does not accord great weight to the hearing officer's determination. (*Patterson Flying Service v. Department of Pesticide Regulation* (2008) 161 Cal.App.4th 411, 430 [74 Cal.Rptr.3d 290].)

The scope of our review from a judgment on a petition for writ of mandate is the same as that of the trial court. (*California Youth Authority, supra*, 104 Cal.App.4th at p. 584; Code Civ. Proc., § 1094.5, subd. (c).)

### 2. *Analysis*

Judge Pipkin stated that "[t]he most damaging allegation about what [Norton] told others was that he told Villegas that Inmate V. said she was going to hang herself, and that he jokingly told her to go ahead." Judge Pipkin discounted Villegas's testimony, however, because she stated his "recall was very spotty," and "[h]e did not recall the exchange about suicide until asked to read a portion of the investigator's report." However, at the time Villegas was asked to refresh his recollection of his conversation with

Norton, the only thing he testified not remembering was whether Inmate V. had asked for the light to be turned on or off.

The record shows that counsel for the DCR asked Villegas about Norton's routine for doing security checks, and Villegas concluded with the statement that Norton "would also, like tell the inmates or give the inmates the opportunity to have the lights on or off." Counsel then asked whether Norton always complied with the inmates' requests. Following discussion among counsel and the administrative law judge, counsel for the DCR asked Villegas to read a report, and Villegas's counsel objected to Villegas refreshing his recollection because he had not been asked anything he did not recall. Counsel for the DCR then asked Villegas, "Did Norton discuss how Inmate V. was acting that night?" Villegas replied, "I remember him saying that, that she wanted the light on or off. I don't remember." Villegas was asked to refresh his recollection by reading a portion of a report. Counsel for the DCR then asked, "What did Norton tell you that Inmate V. supposedly said?" Villegas replied, "That she was going to hang herself." He further testified that in reply, Norton had "said, jokingly said go ahead."

 Thus, although Villegas was asked to refresh his recollection before he testified that Norton had told him about jokingly telling Inmate V. to hang herself, the record does not support Judge Pipkin's conclusion that Villegas did not remember the conversation with Norton before reading the report. Here, as noted, Judge Pipkin decided the case solely on her review of the record. Thus, her determination of credibility is entitled to no particular deference. (Gov. Code, § 11425.50, subd. (b).) Unlike Judge Pipkin, we find Villegas's testimony highly credible, particularly when considered in light of Norton's actions in accusing Campos of being a snitch, in attempting to discover what Campos had reported about the incident, and in attempting to discredit Inmate V.

Considering all the evidence presented, including that which detracted from the agency's decision, we conclude there was no substantial evidence supporting the finding that the DCR had failed to prove allegation F. (See *California Youth Authority, supra,* 104 Cal.App.4th at p. 585.)

C. *The SPB's Penalty Determination*

Norton contends the SPB did not abuse its discretion by reducing his penalty from termination to a 30-day suspension.

1. *Standard of Review*

" ' "The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. . . .

Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." [Citations.]' [Citation.]" (*Pollak v. State Personnel Bd.* (2001) 88 Cal.App.4th 1394, 1404 [107 Cal.Rptr.2d 39].) This court reviews de novo the administrative agency's determination of penalty, giving no deference to the trial court's decision on the issue. (*Ibid.*)

The SPB "is an agency of constitutional authority; hence, once the SPB renders a decision, its determination regarding whether the facts justify discipline and, if so, what the appropriate penalty should be, will not be disturbed in a mandamus proceeding unless the SPB patently abused its exercise of discretion by acting arbitrarily, capricious, or beyond the bounds of reason. [Citations.]" (*County of Siskiyou v. State Personnel Bd.* (2010) 188 Cal.App.4th 1606, 1615 [116 Cal.Rptr.3d 469].) "The fact that reasonable minds may differ as to the propriety of the penalty imposed fortifies the conclusion that the administrative body acted within the area of its discretion. [Citation.]" (*Flowers v. State Personnel Bd.* (1985) 174 Cal.App.3d 753, 761 [220 Cal.Rptr. 139].) However, an administrative agency abuses its discretion if it modifies or revokes the discipline imposed by the appointing entity if the agency's findings are not supported by substantial evidence. (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831 [284 Cal.Rptr. 839].)

### 2. *Additional Background*

The DCR terminated Norton's employment; however, Judge Pipkin reduced his penalty to a 30-day suspension, explaining, "Taking into consideration the number of serious charges that were dismissed and his record, dismissal is too harsh a penalty. A 30-day suspension should be sufficient to impress on [Norton] that he needs to treat both staff and inmates with respect. Although the dismissal is overturned, it is hoped that serious consideration will be given to [Norton's] assignment upon his return, so that he will not be assigned to work on a unit with the most vulnerable of inmates, those with mental health concerns." The SPB adopted her decision.

The trial court held that the administrative law judge abused her discretion in reducing Norton's penalty from termination to a 30-day suspension, because she "failed to consider the extent to which [Norton's] conduct resulted in or if repeated is likely to result in harm to the public service . . . ."

### 3. *Analysis*

"While an administrative agency has broad discretion in the imposition of penalty or discipline, that discretion is not unlimited. In considering whether

an abuse of discretion occurred in the discipline of a public employee, the overriding consideration is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, harm to the public service. Other factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Warren v. State Personnel Bd.* (1979) 94 Cal.App.3d 95, 107–108 [156 Cal.Rptr. 351].) In weighing such factors, the court considers the nature of the employee's profession, "since some occupations such as law enforcement, carry responsibilities and limitations on personal freedom not imposed on those in other fields. [Citation.]" (*Thompson v. State Personnel Bd.* (1988) 201 Cal.App.3d 423, 429 [247 Cal.Rptr. 210].)

In our view, Judge Pipkin's recommendation that Norton not be reassigned to work with vulnerable mentally ill inmates is tantamount to a determination that Norton's misconduct might indeed be repeated, and that such misconduct would likely result in harm to the public service. As noted, the "overriding" consideration in the determination of penalty is the potential for harm to the public service. (*Warren v. State Personnel Bd., supra,* 94 Cal.App.3d at pp. 107–108.)

Moreover, the other sustained allegations of misconduct would independently support the penalty of termination. To recap, Judge Pipkin found that Norton had (1) refused to turn on the light for a mentally ill inmate who told him she wanted the light on to cope with hallucinations, and he did so as "a show of power"; (2) ridiculed Campos and called him a "pussy" for crying after discovering Inmate V.'s suicide attempt; pressured Campos to give him a copy of his report of the incident and had called Campos a snitch; (3) claimed to other officers that Campos was lying about the incident, even though Norton did not know what Campos had reported; (4) left his assigned post to alter Inmate V.'s bed card while knowing he was under investigation, and he inserted a self-serving statement on the card; and (5) lied about having permission to visit the SCU.

█ Case law and SPB decisions establish that peace officers may be held to higher standards of conduct than civilian employees. (See, e.g., *Department of Corrections & Rehabilitation v. California State Personnel Bd.* (2007) 147 Cal.App.4th 797, 808 [54 Cal.Rptr.3d 665].) More specifically, dishonesty by law enforcement personnel is treated harshly. (See, e.g., *Paulino v. Civil Service Com.* (1985) 175 Cal.App.3d 962, 972 [221 Cal.Rptr. 90] [upholding dismissal of deputy sheriff who lied about sick leave usage]; *Flowers v. State Personnel Bd., supra,* 174 Cal.App.3d at p. 761 [upholding dismissal of correctional officer for dishonesty, attempting to steal state property, and insubordination].)

In *In the Matter of the Appeal by Ethel Warren* (1999) SPB Case No. 98-2130, the SPB affirmed the dismissal of a correctional officer for, among other misconduct, dishonesty and discourteous treatment of inmates and fellow officers. In that case, as here, the officer had called a fellow employee a "snitch" and a "rat" and lied about it in her investigatory interview. (*Id.* at pp. 20, 22.) (<http://www.spb.ca.gov/serp.aspx?q=SPB+98-2130&cx=001779225245372747843%3Aq6meg_j40hu&cof=FORID%3A10&ie=UTF-8&submit.x=18&submit.y=9> [as of Mar. 13, 2012].)

■ With respect to her conduct to her fellow officer, the SPB stated, "There is also sufficient evidence in the record to establish that appellant's failure of good behavior may result in the impairment or disruption of public service in the Department. In the quasi-military environment of a prison, correctional officers must depend upon each other for the effective and safe functioning of the institution. Close working relationships between correctional officers based upon loyalty, trust and confidence are essential to fulfilling the institution's public responsibilities. A correctional officer working in a prison setting must work cooperatively with fellow officers and act in a manner that ensures that no fellow officer's authority is undermined." (*In the Matter of the Appeal by Ethel Warren, supra,* at p. 23.)

■ In *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716 [34 Cal.Rptr.3d 1], a deputy sheriff was dismissed after he lied to cover up another deputy's physical abuse of an inmate, but the civil service commission reduced his penalty to a 90-day suspension. The Court of Appeal held that such reduction was an abuse of discretion. The court explained: " 'An abuse of discretion occurs where, as here, the administrative decision manifests an indifference to public safety and welfare. "In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." [Citation.] The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability.' [Citation.] Accordingly, this is not a case where reasonable minds can differ with regard to the appropriate disciplinary action. [Citation.]" (*Id.* at p. 721.) As the court noted, "The safety and physical integrity of inmates is one of the office's paramount responsibilities." (*Id.* at p. 722.)

The same analysis applies in this case. Even Judge Pipkin stated that dismissal would have been the appropriate penalty for encouraging a mentally ill inmate to attempt suicide.

We conclude the SPB abused its discretion by reducing Norton's punishment from termination to a 30-day suspension. We therefore affirm the judgment of the trial court.

## IV. DISPOSITION

The judgment is affirmed. Costs are awarded to plaintiffs and respondents.

Richli, J., and King, J., concurred.