Filed 11/15/13  City of Calexico v. Calexico Personnel Commission CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF CALEXICO, | D063152 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. ECU06738) |
| CALEXICO PERSONNEL COMMISSION, | |
| Defendant; | |
| SHAUN SUNDAHL, | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Jeffrey B. Jones, Judge.  Reversed.

Lackie, Dammeier & McGill; Law Office of Michael A. Morguess and Michael A. Morguess for Appellant and Real Party in Interest.

McDougal, Love, Eckis, Boehmer & Foley, Steven E. Boehmer and Carrie L. Mitchell for Plaintiff and Respondent.

Shaun Sundahl, who was employed by the City of Calexico's police department (the Department) as a sergeant, appeals from the trial court's decision in favor of the City of Calexico, its chief of police and its city manager[1] (collectively, the City) in this administrative mandamus proceeding.  The City brought this action pursuant to Code of Civil Procedure section 1094.5 to challenge a decision by the Personnel Commission of the City of Calexico (the Commission) determining that Sundahl should be demoted rather than terminated for certain violations of Department policies.

Sundahl contends that the trial court erred in ruling that the Commission was required, under the circumstances, to permanently terminate Sundahl's employment rather than demote him.  We conclude that the Commission was within its discretion to determine that demotion rather than termination was the appropriate discipline to impose on Sundahl.  Accordingly, we reverse the trial court's judgment granting the petition, and we direct that judgment be entered denying the petition.

I

FACTUAL AND PROCEDURAL BACKGROUND

Sundahl began work for the Department in 2003 as a police officer, and he was promoted to sergeant in March 2007.

This proceeding concerns the discipline imposed on Sundahl by the City as a result of several internal affairs investigations by the Department into Sundahl's alleged violation of Department policies during three incidents that occurred in late 2007 and

---

1    James Neujahr is the chief of police, and Oscar Rodriquez is the city manager.

2008, after Sundahl became a sergeant. Those incidents, which we will discuss in more detail below, concerned (1) Sundahl's order that a subordinate officer use a taser to control a burglary suspect who was attempting to escape into Mexico by wading through a polluted river; (2) Sundahl's handling of a high-tension confrontation with several citizens after police responded to a domestic violence call; and (3) Sundahl's failure to report to his superiors that one of his subordinates had recorded a conversation with a fellow officer while discussing the fellow officer's off-duty violation of traffic laws. After conducting its investigation, the Department concluded that Sundahl violated several Department polices and recommended that he be demoted from his position as sergeant.

At Sundahl's request, a hearing was held pursuant to *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 204, resulting in a decision by the city manager that the charges against Sundahl were well founded and that the discipline should be *increased* from demotion to termination of Sundahl's employment.[2]

Sundahl appealed to the Commission. After a lengthy hearing, which included the testimony of numerous witnesses, the Commission determined that although the Department had cause to discipline Sundahl, the appropriate level of discipline was

---

[2]    We note that in reaching his decision, the city manager expressly considered certain personnel grievances that Sundahl filed but that were not cited in any formal notice of adverse employment action by the Department against Sundahl. Although Sundahl's grievances appear in the administrative record, neither the Commission nor the trial court relied on them in reaching its conclusion about the proper discipline to impose on Sundahl, and the City does not cite them as a justification for terminating Sundahl. Accordingly, we have not relied on the grievances in conducting our analysis.

demotion from Sundahl's position as sergeant to the last nonsupervisory position that he held, not termination.

The City filed this administrative mandamus proceeding in the trial court to challenge the Commission's decision on the appropriate level of discipline. Based on its review of the administrative record, the trial court concluded that the Commission abused its discretion in determining that demotion, rather than termination, was appropriate, and it ordered the Commission to amend its decision to include a determination that Sundahl be permanently terminated from his employment with the City.

This action is now before us on Sundahl's appeal from the trial court's decision granting the relief sought by the City's petition.

II

DISCUSSION

A.     *Applicable Legal Standards*

Before examining whether the record supports the Commission's decision, we discuss the legal standards applicable to our review.

Because the sole focus of the City's petition is a challenge to the penalty that the Commission imposed on Sundahl, we apply an abuse of discretion standard of review to the Commission's decision. "'"'The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. . . . Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.'"'" (*Cate v. State Personnel Bd.* (2012) 204 Cal.App.4th 270, 283-284 (*Cate*).) "If reasonable minds may

4

differ as to the propriety of the penalty imposed, there has been no abuse of discretion. [Citation.] It is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown." (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 46-47 (*Deegan*).) In conducting our review of "the administrative agency's determination of penalty," we give "no deference to the trial court's decision on the issue" and focus exclusively on the Commission's decision. (*Cate*, at p. 284.)

To the extent our analysis requires us to review the Commission's factual findings, our inquiry is limited to whether the Commission's findings are supported by substantial evidence. (*Kolender v. San Diego County Civil Service Com.* (2007) 149 Cal.App.4th 464, 470-471 (*Kolender II*).) Although some administrative mandamus proceedings require an independent review by the trial court depending on whether the administrative decision involves a fundamental vested right (*Saraswati v. County of San Diego* (2011) 202 Cal.App.4th 917, 926), the independent review standard does not apply here because the instant mandamus petition was brought by the City rather than Sundahl. " ' "It is well-established that an employ*er*'s right to discipline or manage its employees . . . is *not* a fundamental vested right entitling the employ*er* to have a trial court exercise its independent judgment on the evidence. [Citations.]" [Citation.] Therefore, the trial court was required to utilize the substantial evidence test in reviewing the commission's decision. And on an appeal from the decision of the trial court, we review the administrative decision, not the superior court's decision, by the same standard — the substantial evidence test.' " (*Kolender II*, at p. 470, italics omitted.) "Under the

5

substantial evidence rule, reasonable doubts on conflicting evidence must be resolved in favor of the factual resolution by the Commission." (*Lowe v. Civil Service Com.* (1985) 164 Cal.App.3d 667, 676.)

B.      *The Three Incidents Giving Rise to the Discipline Imposed on Sundahl*

We will now review the facts, as presented to the Commission, concerning the three incidents that gave rise to the internal affairs investigations against Sundahl and formed the basis for the discipline imposed on him.[3]

1.      *The New River Incident*

On August 26, 2008, Sundahl, along with other officers, responded to a theft at an auto parts store in Calexico. The suspect ran from the police and waded into the New River in an attempt to flee to Mexico. The New River is extremely contaminated, and human contact with it poses a health risk. Sundahl ordered a subordinate officer to deploy a taser on the suspect from about 20 feet away when the suspect was in waist-deep water, with the expectation that the suspect would comply with orders to exit the river and would submit to police custody after experiencing the pain caused by the taser.

Officers are trained that tasers are to be deployed on a suspect in water only if there is a clear plan of action so the suspect doesn't drown. It occurred to Sundahl that the suspect could become incapacitated because of the taser and drown. Sundahl nevertheless proceeded with the plan to deploy the taser, thinking that although he would

_____

[3]      Numerous witnesses testified before the Commission, and the evidence was often conflicting as to the details of what occurred. We have reviewed the evidence and have found the Commission's findings, in all material respects, to accurately and fairly summarize the evidence presented.

never order an officer to enter the contaminated river, in the event that a rescue was needed he would ask for volunteers from among his subordinate officers or he would enter the river himself. Sundahl did not communicate his rescue plan to the officers at the scene.

The taser was successfully deployed without harm to the suspect, who exited the river and was taken into custody and charged with burglary. Although other officers recognized the suspect as a known resident of Calexico, Sundahl testified that he did not recognize the suspect until after the suspect exited the river.

The Department's internal affairs investigation concluded that during the New River incident Sundahl violated Department policies on the use of reasonable force, in that he ordered that the taser be deployed in a high-risk situation without exhausting other means of apprehending the suspect.

In its assessment of Sundahl's performance during the New River incident, the Commission offered the following criticism:

> "As a sergeant, Sundahl did not consider alternatives such as enlisting the assistance of the Mexican police authorities or obtaining a warrant for [the suspect's] arrest and executing the warrant at the residence in Calexico he was known to stay. Instead, and contrary to the training he had received, Sundahl ordered deployment of a taser on a suspect waist deep in a body of polluted water.

> "Sundahl failed to take control of the scene in a manner the City would reasonably expect its sergeants to do. He failed to gather information from other officers. He did not ask any questions. The only inquiry made by Sundahl was whether a bean[]bag gun was available. Sundahl did not demonstrate the good judgment and leadership reasonably expected of a sergeant. Sundahl had several minutes to determine a course of action and given that considerable amount of time, by law enforcement standards, could do no better than to order deployment of a taser and then hope for a

7

volunteer to enter the New River in the event the suspect became incapacitated."

2.    *The Horizon Street Incident*

On September 14, 2008, Sundahl responded to a call from other officers for emergency backup on Horizon Street in Calexico where an incident of domestic violence had been reported. When Sundahl arrived, several officers were already present, and an angry crowd had formed. Tension was developing over the officers' continued detention of 16-year-old Christian Silva, who had initially been handcuffed and placed in a police car to investigate his role in the incident. Sundahl learned that Christian Silva was not involved in the domestic dispute, and officers were attempting to release him from custody.

A total of nine other officers were on the scene, some of whom were controlling the surrounding crowd, which included Christian Silva's mother and father — Eva and Carlos Silva. Although Christian Silva was agitated about being detained, when he calmed down enough to be released, the officers removed his handcuffs. Christian Silva then punched the curb with his fists and lunged at one of the officers. An officer placed the handcuffs back on Christian Silva because of his violent behavior.

After Christian Silva was handcuffed a second time, Eva and Carlos Silva became aggressive. When Eva Silva tugged on an officer, trying to obtain the release of her son, Sundahl pushed her to the ground to stop her interference. Although accounts of Carlos Silva's behavior differ between witnesses, it is generally agreed that he became combative to obtain the release of his son. Sundahl testified that Carlos Silva took a

8

fighting stance against him and clenched his fists. Another officer remembered seeing Carlos Silva pushing Sundahl. In the ensuing altercation, Sundahl and another officer hit Carlos Silva with a baton several times to get him to retreat, which caused bruising and injury to Mr. Silva.

After Carlos Silva ran into a house, the officers first unsuccessfully tried to kick down the door, and then finally gained access when one of the occupants opened the door. Mr. Silva was taken into custody and charged with resisting or obstructing a peace officer, but the People eventually dismissed the charges.

The Department's internal affairs investigation of the Horizon Street incident determined that Sundahl violated Department policies on the use of reasonable force and appropriate conduct by a supervisor. The investigator concluded that "[i]f the situation would have been supervised properly, Mr. Carlos Silva would have not been physically struck by . . . Sundahl."

The Commission expressed the following criticism of Sundahl's performance during the Horizon Street incident:

> "As a sergeant, Sundahl had the duty to organize and direct his subordinates so that the safety of officers and citizens could be protected. Sundahl demonstrated poor judgment and a lack of leadership when he failed to take charge of the scene, garner information, order release of Christian and order his officers to vacate the scene."

3. *Tape Recording Incident*

In late 2007 or early 2008, Sundahl was told by Officer Flores, whom he supervised, that Officer Flores had secretly recorded a conversation with a colleague, Officer Lopez, after observing Officer Lopez driving recklessly during off-duty time and

9

failing to yield when Officer Flores tried to stop him. Sundahl advised Officer Flores against creating such recordings, but he did not report the recording to anyone else in the Department.

After conducting an internal affairs investigation of the tape recording incident, the Department concluded that Sundahl violated a Department policy requiring an officer to report to superiors when learning of the commission of a criminal offenses by another officer. Specifically, the Department concluded that Sundahl learned that Officer Flores had violated Penal Code section 632, which makes it a crime to record a conversation without a person's knowledge.[4]

In its internal affairs investigation of the tape recording incident, the Department also relied on Department policy 450.3, which prohibits one member of the Department from surreptitiously recording a conversation with another member of the Department. The Department's internal investigation concluded that Sundahl should have explained the policy to Flores and should have internally reported Flores's policy violation.[5]

The Commission came to the following conclusion concerning Sundahl's handling of the tape recording incident:

---

[4]    We note, however, that a significant unresolved legal dispute during the hearing before the Commission was whether Officer Flores even violated that statute, as Penal Code section 633 creates an *exception* for recordings made by a police officer "acting within the scope of his or her authority." (*Ibid*.)

[5]    As was acknowledged by the City during the Commission's hearing, policy 450.3 did not go into effect until *after* Flores recorded the conversation with Lopez. Sundahl did, however, testify that he knew the Department had a predecessor policy on the same subject, which apparently prohibited an officer from secretly recording a conversation except during a criminal investigation.

"Sundahl was aware of a department policy against recording a conversation with another officer without that officer's express knowledge and consent. Sundahl was aware that Lopez had potentially committed various crimes, including either a misdemeanor o[r] felony for failing to yield to an emergency vehicle. Sundahl was also aware of department policy to report to his chain of command any activity that could result in criminal prosecution. Sundahl did not do so with respect to information concerning Lopez's [V]ehicle [C]ode violations or Flores' recording of his conversation with Lopez without Lopez's knowledge. While a violation of policy, the [Commission] finds that the manner in which Sundahl exercised his discretion as a supervisor does not support the level of discipline proposed by the City."

4.      *The Commission's Penalty Determination*

After reviewing each of the three incidents we have described above, the Commission explained its conclusion that demotion from the position of sergeant to a non-supervisory position was the appropriate discipline to impose on Sundahl.

"The [Commission] finds that the penalty of termination is not appropriate in this case. Clearly, Sundahl demonstrated a lack of leadership and the inability to properly supervise a situation. The [Commission] does not find, however, that he lacks the ability or veracity to be a productive police officer. The [Commission] also is mindful that police management had proposed discipline less than termination, but the city manager increased the penalty to termination."

C.      *The Commission Did Not Abuse Its Discretion*

Based on the standard of review we have described, the question before us is whether the Commission abused its discretion in determining that demotion was the appropriate penalty to impose on Sundahl. The Commission abused its discretion only if we determine that "reasonable minds cannot differ on the propriety of the penalty" of termination for Sundahl's misconduct. (*Deegan*, *supra*, 72 Cal.App.4th at p. 47.) As we will explain, we conclude that the Commission was within the bounds of reason to

11

determine that demotion was the proper discipline, and therefore the Commission did not abuse its discretion.

Case law gives us guidance about the relevant factors to consider when determining whether an agency abused its discretion in imposing a certain degree of discipline upon a public employee. "The specific criteria to be considered in evaluating a public employee discipline dispute include whether 'the administrative decision manifests an indifference to public safety and welfare. "In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated, is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." [Citation.] The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability.'" (*Kolender II*, *supra*, 149 Cal.App.4th at p. 471.)

Here, the Commission concluded that Sundahl's problems involved his performance as a supervisor, and that, accordingly, demotion from a supervisory position was sufficient to prevent the recurrence of such incidents, protect the public from the risk of injury and protect the City from the risk of incurring liability as a result of Sundahl's conduct.

The City criticizes the Commission's decision because it believes that Sundahl's mishandling of the three incidents did not arise from deficiencies limited to his supervisory skills. According to the City, Sundahl's conduct shows his unfitness for *any*

12

type of police work.  As we will explain, we disagree.  The Commission clearly explained the manner in which Sundahl's mishandling of the three incidents related to his supervisory skills, and substantial evidence supports the Commission's assessment of the facts.

First, the Commission's findings as to the New River incident focused on Sundahl's performance as a supervisor, concluding that he "failed to take control of the scene in a manner the City would reasonably expect its sergeants to do."  The evidence supports that assessment.  According to our review, Sundahl's principal failures during the New River incident were to fail to gather information from officers about the identity of the suspect to determine whether obtaining an arrest warrant was a better option to employing the taser in a polluted river, and to fail to communicate his rescue plan to the other officers so that it could be put into action in case the suspect began to drown in the river.  Neither of these failings demonstrate an overall unfitness for police work, but rather the lack of communication and organizational skills necessary to succeed as a supervisor.

Second, as described by the Commission, Sundahl's mishandling of the Horizon Street incident also arose from a lack of supervisory skills.  Specifically, the Commission found that Sundahl did not "organize and direct his subordinates so that the safety of officers and citizens could be protected" because he "failed to take charge of the scene, garner information, order release of Christian and order his officers to vacate the scene."  Substantial evidence supports this view of the facts.  Sundahl arrived on the scene of an already tense situation, with his role as a supervisor to take control to prevent the

13

situation from escalating. The officer who conducted the internal affairs investigation for the Department testified that if Sundahl had used his supervisory position to take control from the time he arrived on the scene, the altercation could have been avoided. Specifically, he concluded that Sundahl should have taken time to speak to the other officers and to Carlos and Eva Silva to diffuse the situation before it escalated. The City's own expert witness testified before the Commission that Sundahl's handling of the Horizon incident was deficient because he did not take control as a supervisor and pull out the officers from the location. According to the expert, Sundahl "did not do what a supervisor is supposed to do," and he is "more of doer than a supervisor." He opined that Sundahl should have been "standing back . . . and should not have become physically involved." Collectively, this testimony provides substantial evidence for the Commission's finding that Sundahl's lack of supervisory skills was the central problem at the Horizon Street incident.

Finally, the Commission was within its discretion to view Sundahl's handling of the tape recording incident as a lapse in his performance as a supervisor, criticizing "the manner in which Sundahl exercised his discretion as a supervisor" in that incident. Importantly, the evidence showed that Officer Flores disclosed the tape recording incident to Sundahl because Sundahl was his supervisor and he wanted his supervisor's advice. Sundahl made the decision, as a supervisor, to handle the situation informally. Further, to the extent that Sundahl violated Department policy by failing to report either Officer Flores's possible violation of Penal Code section 632 or Officer Lopez's traffic law violations, the Commission reasonably could conclude that the misconduct by

14

Officer Lopez and Officer Flores was relatively trivial, and therefore Sundahl was not rendered unfit for employment as a police officer because he failed to report that misconduct.

Taking the three incidents together, the City argues that the Commission had no choice but to terminate Sundahl because his "lack of judgment not only implicates [his] inability to supervise, but his inability to be a peace officer at any rank." Based on the facts we have described above, we do not agree that the Commission was required to find Sundahl unfit for non-supervisory police work. As we have discussed, although Sundahl's handling of the three incidents showed flawed judgment, the deficiencies primarily dealt with Sundahl's strategic and organizational skills as a supervisor, not the fundamental skills needed for effective police work.

Sundahl's lapses are nothing like the serious misconduct and extreme bad judgment demonstrated by the law enforcement officers in the cases that that City relies on to argue that Sundahl's conduct requires his termination to protect public safety. (*Hankla v. Long Beach Civil Service Com.* (1995) 34 Cal.App.4th 1216 (*Hankla*); *Cate, supra,* 204 Cal.App.4th 270; *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716 (*Kolender I*).) In *Hankla,* the appellate court concluded that a civil service commission abused its discretion in reinstating the employment of an off-duty police officer who "shot and nearly killed the driver of another vehicle following a heated verbal dispute over a trivial driving incident." (*Hankla*, at p. 1218.) Termination was the only reasonable outcome there because the officer's behavior was "infantile," "patently reckless," showed a lack of "emotional self-control or good judgment" and an inability to

15

"handle competently either his emotions or his gun." (*Id*. at p. 1226.) In *Cate*, the personnel board abused its discretion in suspending rather than terminating a correctional officer who (1) told a suicidal inmate to "'go ahead'" and hang herself; (2) was discourteous to a delusional inmate; (3) attempted to intimidate a witness and exercised undue influence in an internal affairs investigation; (4) made disparaging comments about a fellow correctional officer; and (5) lied about being away from his post with permission. (*Cate*, at pp. 273-274.) The court determined that termination was required because (1) the administrative law judge's recommendation acknowledged that the officer's misconduct "might indeed be repeated"; (2) the officer had been dishonest; and (3) correctional officers were required to work cooperatively with fellow officers and not undermine fellow officers' authority. (*Id*. at pp. 285-286.) In *Kolender I*, the personnel commission abused its discretion in not terminating a deputy sheriff who lied to cover up another deputy's physical abuse of an inmate. (*Kolender I*, at p. 719.) The deputy sheriff's termination was necessary because "[h]e lied regarding a grave matter, and thereby forfeited the trust of his office and the public[,]" and "was complicit in covering up abuse of an inmate," even though the "safety and physical integrity of inmates is one of the [sheriff's] office's paramount responsibilities." (*Id*. at pp. 721, 722.)

Here, the Commission could reasonably determine that Sundahl's conduct, in comparison to that at issue in *Hankla*, *Cate*, and *Kolender I*, was less serious — demonstrating mere mistakes in handling difficult situations, not revealing a fundamental emotional or moral disqualification from serving as police officer, such as cruelty, an explosive temper, dishonesty or lawbreaking.

16

The City describes Sundahl's conduct as so "reprehensible" that it disqualifies him from any type of police work. The evidence does not require such a conclusion. As the Commission reasonably could have concluded, Sundahl simply made several mistakes in assessing a situation and implementing his training, but his conduct was not morally reprehensible or so out of the bounds of acceptable behavior that it required his termination. Indeed, instead of laying all the blame for Sundahl's failures as a supervisor on Sundahl's character flaws, the Commission appears to have reasonably concluded from the evidence that Department should have better trained its supervisors, as it commented that "[t]he City is encouraged to provide education and training to its supervisors in order to increase the likelihood persons occupying those positions will succeed." Although the City states, in a conclusory argument, that the three incidents demonstrate Sundahl's "lack of truth and veracity," we disagree. None of Sundahl's failures during the three incidents involved problems with Sundahl's honesty, but instead involved his mishandling of difficult situations.[6]

---

6     Although the City claims that Sundahl lacks "truth and veracity" and that this case is analogous to those in which law enforcement officers were terminated for dishonest conduct, the only specific argument that the City makes concerning Sundahl's lack of veracity is its statement that the Commission's own discussion of the Horizon Street incident "suggests [Sundahl's] dishonesty by recognizing that [Sundahl's] testimony that the crowd was unruly was contradicted by another officer's testimony that the crowd was calm." We are not convinced. As we read the Commission's statement, it was commenting on a conflict in the evidence rather than making a finding that Sundahl lied during his testimony. As our own review of the record shows, the testimony regarding the Horizon Street incident was wildly inconsistent between witnesses. Although some witnesses did not describe an unruly crowd, several witnesses, including other police officers, described the crowd as hostile and threatening, requiring the first police officers on the scene to call for emergency assistance. The Commission's findings included the

In sum, the Commission was within its discretion to decide that, based on the three incidents reflected in the record, Sundahl was not fundamentally unfit to serve as a police officer, and therefore demotion — instead of termination — was the proper discipline to impose on Sundahl.

### DISPOSITION

The judgment is reversed, and the trial court is directed to enter judgment denying the City's petition for writ of mandate.

IRION, J.

WE CONCUR:

MCCONNELL, P. J.

NARES, J.

statement that Sundahl did not "lack[] the . . . veracity to be a productive police officer," showing that the Commission did not conclude, based on the inconsistencies in the testimony about the Horizon Street incident, that Sundahl was a dishonest person. Moreover, serious due process objections might be raised were Sundahl to be terminated by the Commission — without notice — based on possible dishonesty that occurred during his testimony before the Commission. (*Parker v. City of Fountain Valley* (1981) 127 Cal.App.3d 99, 107 [right to advance notice and chance to respond to additional disciplinary charges].)