Filed 3/30/26  Mooradian v. State Personnel Board CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THEODORE B. MOORADIAN,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>STATE PERSONNEL BOARD,<br><br>Defendant and Respondent;<br><br>DEPARTMENT OF TRANSPORTATION,<br><br>Real Party in Interest and Respondent. | F088318<br><br>(Super. Ct. No. 22CECG01024)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Daniel J. Brickey, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)

Sagaser, Watkins & Wieland and Howard A. Sagaser for Plaintiff and Appellant.

Erin E. Holbrook, Alan M. Steinberg, Gina L. Cardoza, Valerie Velasco, and Bahar M. Hamidi for Real Party in Interest and Respondent.

-ooOoo-

Plaintiff and appellant, Theodore B. Mooradian, appeals from a judgment denying his petition for a writ of mandate in which he challenged a decision of the State Personnel Board (SPB) sustaining his demotion from senior transportation engineer with the Department of Transportation (Caltrans) to transportation engineer (civil) range D. We reverse in part, affirm in part, and remand with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Notice of Adverse Action.

On May 8, 2019, Caltrans served Mooradian with a notice of adverse action (NOAA) that notified him he was being demoted from his position as a senior transportation engineer with Caltrans to the position of transportation engineer (civil) range D "effective at the close of business on May 15, 2019." The grounds for the adverse action were stated, as follows: "Inefficiency" (Gov. Code, § 19572, subd. (c));[1] "Inexcusable neglect of duty" (*id*., at subd. (d)); "Dishonesty" (*id*., at subd. (f)); "Willful disobedience" (*id*., at subd. (*o*)); and "Other failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing authority or the person's employment" (*id*., at subd. (t)).

The NOAA alleged four acts or omissions upon which the adverse action was based, namely: (1) on February 25, 2019, Mooradian stored his state-issued vehicle overnight at his residence without obtaining permission from his supervisor, Douglas Lambert; (2) on February 28, 2019, Mooradian submitted a falsified travel expense claim (TEC) in which he claimed reimbursement for an $11 lunch to which he was not entitled; (3) in that same TEC, Mooradian falsely claimed reimbursement for a $23 dinner to which he was not entitled; and (4) Mooradian was dishonest in responding to Lambert's questions regarding the falsified TEC.

---

[1]      All further statutory references are to the Government Code unless otherwise stated.

Caltrans reimburses meal expenditures incurred during work travel based on factors such as when an employee begins or ends his work-related travel, and also whether travel extends more than 24 hours. To demonstrate their entitlement to meal reimbursement(s), Caltrans employees are required to write their departure and return times on their TECs. The NOAA alleged GPS records would demonstrate Mooradian did not depart and return at the times he wrote on his TECs.

The NOAA included, without limitation, a description of relevant Caltrans policies, manuals and/or directives; information as to his appeal rights (including his right to a *Skelly* hearing);[2] and documents relevant to the charges lodged against him.

The demotion took effect on May 15, 2019, as indicated on the NOAA. On June 14, 2019, Mooradian appealed his demotion to the SPB. Mooradian submitted a five-page "Appeal and Answer" with his SPB appeal form in which he claimed he was denied a *Skelly* hearing unless he signed a "Waiver of Due Process Rights," and that the NOAA "reflect[ed] a continuing pattern of harassment" toward him by Lambert and was "merely pretext as a form of retaliation for [him] exercising … his constitutional rights." He sought reinstatement of his position as a senior transportation engineer as well as damages for lost wages incurred following the effective date of his demotion.

## II.     October 2019 Hearings Before an Administrative Law Judge.

On October 23 and 24, 2019, hearings on the matter were held before SPB Administrative Law Judge Anthony Musante (ALJ).

On November 14, 2019, the ALJ issued his proposed decision. On January 16, 2020, the SPB adopted the proposed decision (the 2019 Decision) as its decision in the case. As discussed, *post*, the 2019 Decision would later be set aside, and a new hearing

---

[2]     "A *Skelly* hearing is an opportunity for the employee to respond to the charges in the notice of adverse action." (*Benefield v. Department of Corrections & Rehabilitation* (2009) 171 Cal.App.4th 469, 472, fn. 6, citing *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 206 (*Skelly*) and other case law.)

and decision would follow. Notwithstanding, we briefly set forth below certain determinations made by the ALJ in the 2019 Decision.

The ALJ determined, without limitation, that Mooradian failed to prove his affirmative defense of retaliation and failed to prove a *Skelly* violation. Accordingly, the ALJ dismissed Mooradian's retaliation defense and his *Skelly* claim. These two determinations were not reiterated or addressed in the subsequent decision that issued.[3]

**III. The 2019 Decision Is Set Aside and a New Evidentiary Hearing Is Conducted.**

On May 12, 2021, the SPB issued a "Resolution Pursuant to Court Remand" (unnecessary capitalization omitted) that stated Mooradian had "filed a Petition for Writ of Mandate in [Fresno County Superior Court] (Case No. 20CECG01299) to compel the [SPB] to set aside its decision." The resolution included the following attached exhibits: the court's April 13, 2021, "Judgment Remanding Action Back to California State Personnel Board" (unnecessary capitalization omitted) (Remand Judgment); the minute order and tentative ruling upon which the Remand Judgment was based; and appendix B to Mooradian's writ petition. The Remand Judgment read, in pertinent part: "The [SPB] shall set aside its current decision and reconsider it in light of the relevant evidence attached as Appendix B to [Mooradian's] Petition for Writ of Mandamus that was improperly excluded at the hearing …."

Accordingly, the SPB set aside the 2019 Decision, and referred the matter to the chief administrative law judge or his designee to conduct a new evidentiary hearing "for the purpose of considering the evidence attached to [Mooradian's] Writ Petition as Appendix B." That evidence consisted solely of TECs, and related receipts, submitted by various other Caltrans employees to claim reimbursement for travel expenses such as meals and lodging.

---

[3] No party has raised the fact that these determinations in the 2019 Decision were not addressed in the subsequent decision as an issue on appeal.

4.

On October 5, 2021, ALJ Musante conducted another hearing on the matter. At the commencement of the hearing, he stated, "The evidentiary … hearing is being conducted 'for the purpose of considering the evidence attached to … [Mooradian's] writ petition as Appendix B as directed by the [Remand Judgment] and the order and tentative ruling of the Superior Court.' "

At the hearing, Caltrans's counsel argued the scope of proceedings should be limited to the penalty that should be imposed on Mooradian. In response, Mooradian's counsel advised that the appendix B evidence would show that other witnesses to be called had made repeated errors on their TECs but were never investigated or disciplined. The ALJ interpreted this response as an agreement, at least in part, as to the scope of the proceedings. The ALJ also noted that Mooradian's counsel argued Lambert had an ulterior motive and "tried to cause through a Cat's Paw Theory[4] the demotion of [Mooradian]," which the ALJ conceded could theoretically be shown by the evidence. The ALJ, however, cognizant of the superior court's ruling on Mooradian's 2020 writ petition, largely limited the hearing to the evidence in appendix B of the petition and witnesses who could provide testimony regarding the same.

On October 13, 2021, the ALJ issued a revised proposed decision (the 2021 Decision). On November 10, 2021, the SPB adopted the 2021 Decision as its decision in the case.

---

**4**　"In the employment context, ' "cat's paw" ' refers to a situation in which a biased subordinate who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action. [Citation.]' [Citation.] Under the 'cat's paw' theory, a showing that any 'significant participant' in the adverse employment decision exhibited discriminatory animus is 'enough to raise an inference that the employment decision itself was discriminatory.' " (*Hoglund v. Sierra Nevada Memorial-Miners Hospital* (2024) 102 Cal.App.5th 56, 76.)

## IV. The 2021 Decision.

In the 2021 Decision, the ALJ framed the issues to be resolved by him, as follows: "1. Did [Caltrans] prove the charges by a preponderance of the evidence? [¶] 2. If [Caltrans] proved the charges by a preponderance of the evidence, does [Mooradian's] conduct constitute legal cause for discipline under Government Code section 19572, subdivisions: (c) inefficiency; (d) inexcusable neglect of duty; (f) dishonesty; (o) willful disobedience; and/or (t) other failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing authority or the person's employment? [¶] 3. If [Mooradian's] conduct constitutes legal cause for discipline, what is the appropriate penalty?"

### A. *Findings of Fact*

The following is a summary of factual findings made by the ALJ in the 2021 Decision:

*Employment History*: Mooradian began his state service in 1991 as an associate transportation engineer. He was promoted to senior transportation engineer in 2001. Mooradian's office was located in Caltrans's District 6 headquarters in Fresno, California, but he oversaw projects in Caltrans's District 5 (San Luis Obispo) and District 10 (Stockton) and regularly travelled between the three District offices. He "supervised up to seven Transportation Engineers" and was responsible for reviewing and approving their TECs.

Mooradian was an exempt employee and regularly worked overtime. As an exempt employee, he was not entitled to overtime pay and "did not record his time when he worked." Mooradian had no prior history of adverse employment actions.

*Use of State-owned Vehicles and Travel Expense Claims (TECs)*: Caltrans employees who travel for work are allowed to use state-owned vehicles for that purpose, a practice Mooradian routinely utilized. "When he did so, he regularly stored the state-

6.

owned vehicle at his home overnight before driving the next morning." He regularly sought and obtained Lambert's approval to do so.

An annual meeting in the San Luis Obispo office was scheduled for February 19 through February 22, 2019. Mooradian and Lambert were among the attendees. "On February 19, 2019, [Mooradian] left his home in his assigned state-owned vehicle at some time before 11:00 a.m.[,]" drove to the meeting, "and stayed overnight in a hotel each night until the meeting concluded on February 22, 2019."

On February 25, 2019, Mooradian advised Lambert "that he intended to store his state-owned vehicle overnight at his home, … so he could leave straight from his home for a meeting in Stockton on February 26, 2019." On February 26, 2019, Mooradian "left his home at 6:14 a.m." and traveled to Caltrans's Stockton office and "returned to the Fresno Caltrans office at 2:14 p.m. that same day."

Caltrans employees are allowed to seek reimbursement for certain travel-related expenses. "When travelling for work, Caltrans employees can claim their actual expenses for meals, up to $7 for breakfast, $11 for lunch, and $23 for dinner. Meal reimbursement, however, is subject to specific restrictions on the timing and duration of the travel. For travel over 24 hours, employees may claim lunch if the trip began at or before 11:00 a.m., and may claim dinner only if the trip began at or before 5:00 p.m." "For continuous travel of less than 24 hours, employees may claim breakfast if the trip begins at or before 6:00 a.m., and may claim dinner if the trip ends at or after 7:00 p.m. Employees may not claim lunch expenses for continuous travel of less than 24 hours."

On February 28, 2019, Mooradian submitted a TEC for expenses incurred during his aforementioned trips to San Luis Obispo and Stockton. He "sought reimbursement for four nights of lodging in San Luis Obispo," "lunch and dinner on February 19, 2019," and "breakfast, lunch, and dinner … for February 26, 2019," and claimed the maximum reimbursement for each meal On the TEC he submitted, he certified his claims were " 'a

7.

true statement of the travel expenses incurred by [him]' " and submitted the TEC to Lambert for approval.

"On March 4, 2019, Lambert emailed [Mooradian] about concerns he had with [Mooradian's] [TEC]." Lambert pointed out that Mooradian had sought four nights of lodging in San Luis Obispo but provided receipts for only three nights of lodging. Lambert advised Mooradian that, "if [Mooradian] left at or before 6:00 a.m. and returned after 7:00 p.m. on February 26, 2019, he was entitled to reimbursement for breakfast and dinner, but not lunch." As a result, Mooradian revised and resubmitted his TEC to reflect only three nights of lodging and omitted the lunch reimbursement he had claimed for February 26, 2019.

After receiving Mooradian's revised TEC, Lambert, by e-mail, asked Mooradian "to clarify what time he left Fresno on February 19, 2019; and February 26, 2019, and what time [he] returned to Fresno on February 26, 2019." Mooradian responded "almost immediately" and "wrote in his email to Lambert that he left Fresno at 11:00 a.m. on February 19, 2019; that he left Fresno at 6:00 a.m. on February 26, 2019; and that he returned to Fresno at 7:00 p.m. on February 26, 2019."

"Lambert remained skeptical." He noted that the start and stop times Mooradian wrote in his TEC "coincided exactly with the times need[ed] for [Mooradian] to receive reimbursement for meal expenses." Lambert requested, and obtained, from staff "a report showing the GPS location of [Mooradian's] state-issued vehicle from February 24, 2019 to March 1, 2019." The report showed that Mooradian "left his home at 6:14 a.m. on February 26, 2019, and returned to the Fresno office at 2:14 p.m. that same day."

On April 2, 2019, Mooradian also requested GPS records for his state-issued vehicle for the dates in question. He received "a report containing the February 26, 2019 GPS records" but was told " 'nothing was captured on GPS for that vehicle on [February 19, 2019].' " The following day, April 3, 2019, Mooradian submitted yet another revised TEC for the dates in question and omitted his lunch claim for February

8.

19, 2019, and his breakfast and dinner claim for February 26, 2019. Mooradian never received reimbursement for those meals.

*Errors on Colleague's Travel Expense Claims*: "From 2015 to 2020, Mark Der Matoian … was Caltrans's Central Region Construction, Division Chief[,]" and is now retired. (Fn. omitted.) "As part of his duties, Der Matoian regularly traveled between the Districts" [and] from his office in Fresno, to the Stockton and San Luis Obispo offices." Der Matoian's assistant would prepare his TEC's and Der Matoian would sign them. The TECs were then signed by Der Matoian's supervisor and submitted to Caltrans's accounting division for reimbursement. "Between February 2015 and August 2018, Der Matoian submitted 14 [TECs] … for reimbursement that contained mistakes." The errors were identified and corrected by the accounting division, which would make handwritten notes explaining why the TECs were revised. The errors the accounting division identified included the following: claiming $6 for incidentals when only $5 reimbursement was allowed; claiming incidentals for travel that was "less than 24 hours in duration"; claiming reimbursement for breakfast when the hotel he was staying at offered a hot breakfast; and claiming $23 dinner reimbursements on four occasions when his trip ended before he was entitled to reimbursement. Caltrans never investigated, and Der Matoian was never counseled or disciplined for these mistakes. Likewise, his assistant was not investigated or disciplined for the mistakes, but she was verbally counseled concerning the errors.

Raafat Shehata was a senior transportation engineer and, after Mooradian's demotion, became Mooradian's supervisor. "Shehata regularly traveled to and from the district offices in Fresno, San Luis Obispo, and Stockton" and, occasionally traveled to other Caltrans offices. Shehata would submit TECs to his supervisor for approval, which were then sent to the accounting division for payment. Shehata's practice was to use "an existing form—filled in with his previous travel details—and update[] it for newly incurred expenses for reimbursement. As a result, his [TECs] often contained non-

9.

substantive inaccuracies that were edited by the Accounting Division ….”  In addition, six TECs “contained requests for reimbursement to which he was not entitled.”  In two of his TECs, Shehata claimed reimbursements for lunch even though his trip ended before 2:00 p.m. and, in two other TECs, he claimed reimbursements for dinner even though his trip ended before 7:00 p.m.  The accounting division would edit the TECs and explain why they were in error.  Shehata also claimed breakfast reimbursements even though his hotel served a free hot breakfast.  Shehata, a Muslim, believed he was entitled to reimbursement because he could not take advantage of the hotel’s hot breakfast due to dietary restrictions imposed by his faith.  In one instance, Shehata made a duplicate entry on his TEC for lodging and meals, which was edited and corrected by the accounting division.  He was never investigated, counseled, or disciplined for mistakes on his TECs.

Both Der Matoian and Shehata “made sure to accurately record the time they left their homes in the morning, and the times they returned to their offices when their travel was completed.”  The ALJ found the errors they made on TECs were the result of “oversight, or not thoroughly understanding Caltrans’[s] [TEC] reimbursement rules.”

*Other Factual Findings*: Lambert, Mooradian’s supervisor, “wanted to reconfigure the Division so that there was one Senior Transportation Engineer at each of the Division’s District Offices: Fresno, San Luis Obispo, and Stockton” and “knew that an administrative change like this could take years to effectuate.”  Lambert was able to accomplish this goal after Mooradian was demoted.

Lori Guinan, deputy district director of administration, “is responsible for, among other things, determining the level of penalty when Caltrans’[s] employees in … District 6 [i.e., Fresno] are disciplined.”  “Guinan determined that [Mooradian] had been dishonest to Lambert about his February 26, 2019, return time from his Stockton trip.”  She “considered other instances of employee dishonesty regarding [TECs] when she made the decision to demote” Mooradian.

### B.    *Credibility Determinations and Dismissal of Certain Allegations.*

The ALJ stated that "[Mooradian's] testimony conflicted with that of Lambert and other evidence presented" at the October 2019 hearings. (Fn. omitted.) Consequently, he made the following credibility determinations:

The ALJ determined Mooradian was credible when he testified "he sought permission from Lambert before storing his state-issued vehicle overnight on February 25, 2019." The ALJ observed that Mooradian was able to recall his conversation with Lambert in great detail, whereas Lambert could not recall Mooradian asking for such permission. Lambert did confirm that Mooradian "regularly asked for permission to store his state-owned vehicle overnight before a trip and that he always granted [Mooradian's] requests."

The ALJ determined Mooradian was not credible, however, when he testified "that the [Caltrans TEC] policy was confusing and that he thought he was entitled to dinner reimbursement for his trip that concluded in his office on the afternoon of February 26, 2019." The 2021 Decision reads, in part: "[Mooradian] testified that he believed he was entitled to reimbursement for dinner if he returned to the office before 7:00 p.m., but did not return to his home until after 7:00 p.m., [and] that his 'trip' did not terminate until he arrived home…. [¶] It is difficult to believe that [Mooradian] thought that his return to the Fresno office on February 26, 2019, did not terminate his trip under the meal reimbursement policy…. [¶] Moreover, [Mooradian] only first questioned the policy's meaning at the hearing, after he was disciplined for claiming a dinner he was not entitled to." The ALJ observed that Mooradian "was responsible for reviewing and approving" the TECs of his subordinates and that, if Mooradian was confused about the meal reimbursement policies, he would have brought up the issue prior to submitting the subject TEC.

The ALJ determined Caltrans failed to prove, by a preponderance of evidence, that Mooradian did not obtain permission on February 25, 2019, to store his vehicle at his

11.

residence overnight, or that Mooradian falsely claimed entitlement to a February 26, 2019, lunch expense ($11) by a preponderance of evidence. As a result, the ALJ dismissed those allegations.

## C. *Charges Sustained and Dismissed, and Penalty Imposed.*

The ALJ dismissed the charge that Mooradian was inefficient for claiming meal reimbursements to which he was not entitled.

The ALJ sustained the charges that Mooradian had "inexcusably neglect[ed] his duties for seeking reimbursement for the February 26, 2019, dinner."

The ALJ also sustained the charge that Mooradian was dishonest "for incorrectly reporting his trip duration to receive reimbursement for meal expenses to which he would otherwise not be entitled." The ALJ found Mooradian "claimed that he returned from his trip to Stockton at 7:00 p.m. on February 26, 2019"; "confirmed by signing his [TEC] that the expenses claimed were the correct travel expenses he incurred," which was false; admitted he returned to Fresno that day at 2:14 p.m., which was "a misrepresentation of a known fact"; and deliberately attempted "to mislead Lambert" about his return time by responding to Lambert's questions that he returned at 7:00 p.m. "to obtain a meal reimbursement to which he was not entitled."

In responding to Mooradian's contention that Der Matoian and Shehata were also dishonest in submitting TECs, the ALJ wrote: "Accurate time reporting is necessary for the Accounting Division to apply the expense reimbursement rules and make corrections …. When false claims are submitted, however, the Accounting Division cannot make those corrections—the claim will appear correct, because the Accounting Division will not be aware of the employee's actual travel times. There was no evidence that Der Matoian and Shehata submitted [TECs] with false time entries, and, unlike [Mooradian], there was no evidence that either employee ever sought to mislead their supervisor in order to obtain a reimbursement."

The ALJ sustained the charge that Mooradian was willfully disobedient by knowingly seeking "reimbursement for a meal that he was not entitled to in contravention of [Caltrans's] travel expense policy." The ALJ rejected the argument that, because Caltrans has not enforced its travel expense policy against others (i.e., Der Matoian and Shehata), it should not be enforced against him. The ALJ again distinguished Mooradian's situation from that of Der Matoian and Shehata, remarking that "[t]here was no evidence that either employee consciously attempted to mislead either their supervisor, or the Accounting Division …."

Finally, the ALJ sustained the allegation that Mooradian failed to adhere to good behavior in a manner that discredited his employer by submitting the false TEC and by misleading his supervisor.

In considering the appropriate penalty to impose on Mooradian, the ALJ remarked, "[W]hile there was no actual harm to the public interest in the form of an undeserved reimbursement to [Mooradian], Lambert now reasonably questions [Mooradian's] honesty—harming the supervisor-employee relationship"; that Caltrans "can no longer trust that [Mooradian] will perform his duties in an ethical manner, and the public may now have a legitimate concern that employees at Caltrans will abuse meal expense reimbursement policies for personal benefit. When an employee, through deception, attempts to receive a personal benefit to which he is not entitled, the public service is significantly harmed." The ALJ further determined Mooradian's credibility as a supervisor was damaged.

The ALJ rejected Mooradian's argument that his conduct "was simply poor work performance, remedied by progressive discipline" and concluded that Mooradian's "nearly 30-year tenure as a state employee" does not mitigate his conduct and "serves as a basis to find that [he] should have known better." The ALJ was critical of Mooradian's failure to accept and admit responsibility for his misconduct, his lack of remorse, his argument that "he complied with his understanding of the [TEC] policy," which the ALJ

characterized as a "stretched interpretation"; and felt those factors "evidence[d] a strong likelihood of recurrence." The ALJ observed that, following demotion, Mooradian may yet again apply for and receive promotion if he "shows himself to be an honest, ethical, and diligent employee."

The ALJ also rejected Mooradian's contention that he was receiving disparate treatment compared to that received by Der Matoian and Shehata noting, again for reasons previously stated, that the facts surrounding their conduct were distinguishable from those surrounding his conduct. The ALJ was also not persuaded by Mooradian's argument that the investigation and discipline he underwent or is undergoing was pretextual—i.e., that Lambert wanted him demoted so that he could reorganize the division to have a senior transportation engineer in each division district office. Finally, the ALJ, while expressing sympathy, was not persuaded that Mooradian's family situation mitigated his conduct.

The ALJ determined that the penalty of demotion was just and proper.

## V.        2022 Petition for Writ of Mandate and Subsequent Appeal.

On April 4, 2022, Mooradian filed a verified petition for writ of mandate to challenge the 2021 Decision. On June 5, 2024, the superior court issued its judgment and denied the petition. Mooradian timely appealed the judgment on July 10, 2024.

## DISCUSSION

## I.        Mooradian's Contentions on Appeal.

On appeal, Mooradian contends he was denied a fair trial and that his due process rights were violated. Specifically, he contends his rights were violated when Caltrans failed to provide him with a *Skelly* hearing prior to disciplining him. Rather, he contends, Caltrans offered to provide him with a *Skelly* hearing that would occur after the discipline was imposed and only upon condition that he sign a waiver of his due process rights.

Mooradian further contends that his demotion was pretextual and that the real reason for his demotion was Lambert's desire to reorganize the division; that Caltrans

14.

failed to preserve evidence relevant to this contention—i.e., e-mails between Lambert and Caltrans's Patrick McNulty and others involved in the disciplinary process; that the ALJ refused to allow him to question McNulty and curtailed his questioning of Lambert; that Caltrans initially concealed the identity of those individuals who conducted the investigation and decided to take adverse employment action against him; that his supervisor, Lambert, initiated the complaint and then conducted the investigation into the complaint; that the ALJ improperly quashed subpoenas to obtain other Caltrans employees' TECs without providing him an opportunity to be heard; and that the SPB failed to conduct an independent review of the evidence, did not have the full record in front of it, and instead, relied on the ALJ's summary of events.

Finally, Mooradian contends the 2021 Decision is not supported by substantial evidence, and, in any event, the discipline imposed was too harsh and unwarranted.

## II.     Standard of Review.

Mooradian acknowledges "[t]he standard of review of [SPB] decisions is usually substantial evidence." He contends, however, that the "substantial evidence standard contemplates that due process has occurred and that the [SPB] has independently reviewed the decision of the ALJ." Mooradian does not directly cite to any authority in support of this contention. However, he does cite to two cases that discuss relevant standards of review applicable to cases before the SPB—*Thaxton v. State Personnel Board* (2016) 5 Cal.App.5th 681, 691–692 (*Thaxton*) and *Cate v. State Personnel Board* (2012) 204 Cal.App.4th 270 (*Cate*).

Caltrans argues the substantial evidence standard of review applies and cites to several cases it contends stand for that proposition. In our view, certain limited issues presented on appeal are subject to de novo review, whereas other issues implicate the substantial evidence and abuse of discretion standards of review. The discussion in *Thaxton* is particularly apt.

The *Thaxton* court addressed the applicable standards of review in reviewing SPB decisions, and wrote, "[t]he SPB is a 'statewide administrative agency which is created by, and derives its adjudicatory power from, the state Constitution. (Cal. Const., art. VII, §§ 2 [membership and compensation of board], 3 ["(a) The board shall enforce the civil service statutes and, by majority vote of all its members, shall … review disciplinary actions"]….) Under that constitutional grant, the [SPB] is empowered to "review disciplinary actions." In undertaking that review, the [SPB] acts in an adjudicatory capacity. "The [SPB] is an agency with adjudicatory powers created by the California Constitution." [Citation.] As such the [SPB] acts much as a trial court would in an ordinary judicial proceeding. Thus, the [SPB] makes factual findings and exercises discretion on matters within its jurisdiction. On review, the decisions of the [SPB] are entitled to judicial deference. The record must be viewed in a light most favorable to the decision of the [SPB] and its factual findings must be upheld if they are supported by substantial evidence.' [Citation.] 'In addition, the [SPB's] exercise of discretion must be upheld unless it abuses that discretion.' [Citation.] An 'abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.' (Code Civ. Proc., § 1094.5, subd. (c).) Further, the scope of review on appeal from a judgment entered by an administrative agency is identical to the scope of review applied by the trial court." (*Thaxton*, *supra*, 5 Cal.App.5th at pp. 691–692.)

" '[S]electing the proper standard of appellate review becomes more difficult when the … determination under review resolves a mixed question of law and fact. Mixed questions are those in which the " 'historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.' " ' " (*Thaxton*, *supra*, 5 Cal.App.5th at p. 692.)

16.

" ' "Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." ' [Citation.] '[I]n most instances, mixed questions of fact and law are reviewed de novo—with some exceptions, such as when the applicable legal standard provides for a " 'strictly factual test, such as state of mind.' " [Citations.] " 'This is so because usually the application of law to fact will require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles.' " ' " (*Thaxton*, *supra*, 5 Cal.App.5th at p. 692.)

The *Cate* opinion discusses the appropriate standard for reviewing a penalty imposed by the SPB, which is also an issue in the case before us. (*Cate*, *supra*, 204 Cal.App.4th at pp. 283–284.) There, it was stated, " ' " '[t]he penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. … Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.' [Citations.]" [Citation.]' [Citation.] This court reviews de novo the administrative agency's determination of penalty, giving no deference to the trial court's decision on the issue." (*Ibid.*)

Cases cited by Caltrans do not conflict with the standard of review principles articulated in *Thaxton* and *Cate*.

Finally, an appellate court is not required to accept factual contentions that are not supported by citations to the record on appeal. (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 534 ["It is not our place to comb the record seeking support for factual assertions."]; *In re Good's Estate* (1956) 146 Cal.App.2d 704, 706

17.

["All courts need the competent and diligent assistance of counsel and are entitled to it."].) An appellate court "may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority or [that] fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt" (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 (*City of Santa Maria*); see *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 162 (*Malibu Hillbillies*).)

## III.     Alleged Due Process Violations.

We address Mooradian's *Skelly* claim in a later section of this opinion since it does not directly impact the conduct of hearings before the ALJ.[5]

### A.     *Lambert's Role in the Investigation.*

Mooradian contends Lambert's claims and investigation were initiated against him as a pretext in order to allow Lambert to reorganize the division so that each district within the division would have a senior transportation engineer. The ALJ did not find this to be true.

" 'The substantial evidence standard of review takes on a unique formulation where, as here, "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals." ' [Citation.] Under these circumstances, ' " ' "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave

---

[5]     The relief available for a proven *Skelly* violation is an award of backpay for the period that "begins at the time discipline is actually imposed and ends on the date the [SPB] files its decision." (*Barber v. State Personnel Board* (1976) 18 Cal.3d 395, 403 (*Barber*).)

no room for a judicial determination that it was insufficient to support a finding.' " ' " ' " (*Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 597.)

Mooradian does not appear to suggest, and does not argue, the evidence *compelled* a finding of pretext, and, in our view, it did not.

Mooradian also contends his due process rights were violated because Lambert initiated the complaint against him and then conducted the investigation. He cites to no authority and provides no cogent argument for this position. Consequently, the latter contention is forfeited. (See *City of Santa Maria*, *supra*, 211 Cal.App.4th at p. 287; *Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 162.)

**B.      *Exclusion of McNulty as a Witness and Alleged Spoliation.***

Mooradian contends the ALJ improperly excluded McNulty as a witness in the 2021 hearing on remand. He also contends e-mails relevant to the case were not preserved. Caltrans makes a number of arguments in response. We do not find Mooradian's arguments persuasive.

**1.      The Exclusion of McNulty as a Witness.**

Mooradian served a notice to appear (Code Civ. Proc., § 1987, subd. (b)) on Caltrans to obtain McNulty's appearance and testimony, and the production of TEC related documents, at the hearing on remand. Caltrans moved to quash the notice to appear. The ALJ granted the motion with respect to McNulty and excluded him from testifying at the hearing on remand.

Mooradian states in his opening brief that "[t]he drafting of the NOAA and the initial recommendation that the penalty be demotion apparently came from Patrick McNulty." Mooradian has not cited any *evidence* that supports the contention. Rather, Mooradian cites to his counsel's arguments and statements to the judge in connection with Caltrans's motion to quash wherein he, among other things, explains his "Cat's

Paw" theory.[6] He also cites to Guinan's deposition testimony regarding her search for e-mails in response to her deposition notice—a fact that will be addressed in the following subsection of this opinion.

In response, Caltrans argues, among other things, that McNulty's testimony "was not relevant to the issues before the [SPB]." We agree.

In our view, the scope of the hearing on remand was properly limited in response to the Remand Judgment. The Remand Judgment required the SPB to "set aside its current decision and reconsider it in light of the relevant evidence attached as Appendix B to [Mooradian's] Petition for Writ of Mandamus that was improperly excluded at the hearing …." As mentioned, that evidence was limited to the TECs and receipts for travel expenses.

Mooradian has not shown that McNulty had any knowledge of the appendix B documents or that he would reasonably be expected to offer information concerning them. Moreover, the argument of Mooradian's counsel to the ALJ (30 pages of which was cited by Mooradian) makes no contention that McNulty had information concerning the appendix B evidence. Rather, it appears Mooradian was attempting to expand the

---

[6] Mooradian cites to more than 30 pages of argument made by his counsel to the ALJ in response to Caltrans's motion to quash the notice to appear, and his attorney's response to the ALJ's ruling on the motion wherein he stated, "McNulty is the middle person of the Cat's Paw and, you know, to use the old analogy, the monkey here is Mr. Lambert who is doing these and manipulating." He argued, "[W]hether or not … Lambert planted the seeds for a demotion in the person making the recommendation" with the information Lambert provided McNulty are critical facts.

In our unaided review of the record on appeal, we observe that Lori Guinan was asked at the hearing on remand "who first recommended to [her] that Mooradian be demoted," to which she replied, "It would've been in a conversation I would've had with [McNulty] regarding the … potential discipline on this case." When asked if she knew whether "McNulty had been in discussion with … Lambert about the appropriate discipline," she replied, "I don't believe so." She testified she had no knowledge of any such discussion.

20.

scope of the hearing on remand to revisit issues that had been the subject of the first hearing before the ALJ, and which were unrelated to the appendix B evidence.

We find no error in the ALJ's decision to exclude McNulty as a witness at the hearing on remand.

### 2. Spoliation.

Mooradian contends Caltrans failed to preserve evidence of e-mails between Lambert, McNulty and others during the investigation and disciplinary proceedings. Caltrans contends Mooradian has not demonstrated he made any valid discovery request for those e-mails, and that the duty to preserve evidence only arises when litigation becomes reasonably foreseeable. It contends many NOAA's do not result in litigation. Caltrans also argues, to the extent documents were purged from Caltrans's operating systems, that it was pursuant to a "routine, good faith operation of an electronic information system," that it would have applied to Caltrans as a whole, and that, in such cases, sanctions are not available, citing Code of Civil Procedure, sections 2023.030, subdivision (f)(1) and 2031.310, subdivision (j)(1).[7] We conclude Mooradian has not shown reversible error.

Mooradian cites several federal court cases that stand for the proposition that "a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." (*In re Napster, Inc. Copyright Litigation* (2006) 462 F.Supp.2d 1060, 1067; see, e.g., *Apple Inc. v. Samsung Electronics Co., Ltd.* (2012) 881 F.Supp.2d 1132, 1137.) California law is similar. (*Victor Valley Union High School Dist. v.*

---

[7] Subdivision (f)(1) of Code of Civil Procedure section 2023.030 provides: "Notwithstanding subdivision (a), or any other section of this title, absent exceptional circumstances, the court shall not impose sanctions on a party or any attorney of a party for failure to provide electronically stored information that has been lost, damaged, altered, or overwritten as the result of the routine, good faith operation of an electronic information system." Subdivision (j)(1) of Code of Civil Procedure section 2031.310 provides similarly.

*Superior Court* (2023) 91 Cal.App.5th 1121, 1153 [" '[A] party's duty to preserve arises when it has notice that the documents might be relevant to a reasonably-defined future litigation' "].)

Mooradian then goes on to discuss what he contends is a "key case"—i.e., *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1 (*Cedars-Sinai*). In that case, the California Supreme Court considered, without limitation, whether it "should recognize a tort remedy for the *intentional* destruction or suppression of evidence by a party to the underlying litigation." (*Id*. at p. 5, italics added.) From the foregoing statement, it does not appear that the routine, good faith operation of an information system was at issue in *Cedars-Sinai*. The high court held "there is no tort remedy for the intentional spoliation of evidence by a party to the cause of action to which the spoliated evidence is relevant, in cases in which … the spoliation victim knows or should have known of the alleged spoliation before the trial or other decision on the merits of the underlying action." (*Id*. at pp. 17–18, fn. omitted.)

As Mooradian notes, the *Cedars-Sinai* court discusses the range of potential sanctions available to a litigant when faced with the intentional spoliation of evidence, including: evidentiary inferences under Evidence Code section 413;[8] and sanctions under Code of Civil Procedure former section 2023, subdivision (b), such as (a) monetary sanctions, (b) contempt sanctions, (c) "issue sanctions ordering that designated facts be taken as established or precluding the offending party from supporting or opposing designated claims or defenses", and (d) "evidence sanctions prohibiting the offending party from introducing designated matters into evidence, and terminating sanctions that

---

[8]    "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case." (Evid. Code, § 413.)

include striking part or all of the pleadings, dismissing part or all of the action, or granting a default judgment against the offending party." (*Cedars-Sinai*, *supra*, 18 Cal.4th at pp. 11–13; but see Code Civ. Proc., § 2023.030, subd. (f)(1) [absent exceptional circumstances, sanctions shall not be imposed for the "routine, good faith operation of an electronic information system"].)

The *Cedars-Sinai* case also discusses the "uncertainty of the fact of harm in spoliation cases." (*Cedars-Sinai*, *supra*, 18 Cal.4th at pp. 13–15.) The court wrote:

> "It seems likely that in a substantial proportion of spoliation cases the fact of harm will be irreducibly uncertain. In such cases, even if the [finder of fact] infers from the act of spoliation that the spoliated evidence was somehow unfavorable to the spoliator, there will typically be no way of telling what precisely the evidence would have shown and how much it would have weighed in the spoliation victim's favor. Without knowing the content and weight of the spoliated evidence, it would be impossible for the [finder of fact] to meaningfully assess what role the missing evidence would have played in the determination of the underlying action. The [finder of fact] could only speculate as to what the nature of the spoliated evidence was and what effect it might have had on the outcome of the underlying litigation.

> " '[I]t is impossible to know what the destroyed evidence would have shown…. It would seem to be sheer guesswork, even presuming that the destroyed evidence went against the spoliator, to calculate what it would have contributed to the plaintiff's success on the merits of the underlying lawsuit…. The lost evidence may have concerned a relevant, but relatively trivial matter.' " (*Id.* at pp. 13–14)

In support of his allegations of spoliation, Mooradian cites Guinan's 2020 deposition testimony taken in connection with a separate lawsuit initiated by Mooradian against Caltrans.[9] At deposition, Guinan testified she reviewed her deposition notice and the document request contained therein. When asked what she did to see if those documents existed, she testified she looked for e-mails related to Mooradian and found

---

[9]    *Mooradian v. State of California State Transportation Agency, dba Cal-Trans*, Fresno County Superior Court case No. 19CECG03115.

none. She testified that Caltrans's e-mail system does not retain e-mails beyond four months. She also testified they received a notice in December 2019 to preserve documents and that, if there were any such e-mails, they would only go back to August 2019. From this testimony, it appears that Guinan's comments related to the routine operation of Caltrans's information system.

Here, it is uncertain whether any relevant documents were actually purged from Caltrans's electronic information system and there is no evidence to suggest that, if relevant documents were purged, that it was done intentionally. Importantly, even if we were to assume that relevant documents were purged, as the *Cedars-Sinai* case illustrates, there is no way for this court to know whether any such documents would have been favorable to Mooradian or to Caltrans. (*Cedars-Sinai*, *supra*, 18 Cal.4th at pp. 13–14.) Consequently, there has been no showing of prejudicial error.[10]

### C. *Identities Allegedly Concealed.*

Mooradian contends the identities of decision makers and the investigator were concealed for a period of time. He did not cite the record on appeal in support of this claim, did not further discuss the facts in support of this allegation, and did not articulate how he was prejudiced by the alleged fact. Consequently, we deem the contention as forfeited. (See *City of Santa Maria*, *supra*, 211 Cal.App.4th at p. 287; *Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 162.)

### D. *No Independent Review by SPB.*

Mooradian contends the SPB was required to conduct an independent review of the 2021 Decision. He contends "no transcript was reviewed by the SPB of the testimony, and no oral argument or briefs were allowed by the SPB." However, he did

---

[10] Moreover, our discussion with regard to the exclusion of McNulty as a witness is equally apt with regard to the issue of alleged spoliation. Whether the e-mails that Caltrans allegedly failed to preserve would have had any relevance to the appendix B issues is speculative.

24.

not cite to any law in support of his argument, did not cite to any authority that discusses the requirements of SPB review or the asserted right of an employee to present oral argument and briefs to the SPB, and made no compelling argument to demonstrate error.[11]  In addition, he made factual assertions for which he provides no citation to the record.  As a result, Mooradian has forfeited this claim, as well.  (See *City of Santa Maria*, *supra*, 211 Cal.App.4th at. p. 287; *Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 162.)

Mooradian attempts to support his contention that the SPB's review was deficient because the SPB failed to review a transcript of proceedings by stating, "[t]he second hearing transcript had not even been prepared until February 20, 2020."  Yet, the record on appeal demonstrates that transcripts for the October 23 and 24, 2019, hearings were

---

[11]     In his reply brief on appeal, Mooradian cites to *Loper Bright Enterprises. v. Raimondo* (2024) 603 U.S. 369 (*Loper*) for the proposition that the U.S. Supreme Court has "rejected the 'Chevron' Doctrine regarding limited review of administrative decisions."  Mooradian provides no pinpoint citations to *Loper*, no discussion of the *Chevron* doctrine or its application to the case and does not explain why he waited until his reply brief on appeal to make his contention.  " 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "  (*Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 146.)

Under the *Chevron* doctrine, courts were sometimes required "to defer to 'permissible' agency interpretations of the statutes those agencies administer—even when a reviewing court reads the statute differently."  (*Loper*, *supra*, 603 U.S. at p. 378; *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* (1984) 467 U.S. 837, 842–843, overruled in *Loper*, at p. 412.)  That does not appear to be an issue in this case and, consequently, we do not appreciate the relevance of *Loper* to the case at bar.

Mooradian also cites to *Center for Biological Diversity, Inc. v. Public Utilities Com.* (2025) 18 Cal.5th 293 to argue this court should apply a de novo review to the ALJ's factual findings.  Again, Mooradian provides no pinpoint citations to any of the principles he contends are provided in *Center of Biological Diversity*.  He argues the case stands for the proposition that a court errs "by applying an unduly deferential standard of review to the administrative agency's quasi-legislative decision."  This case, however, presents a quasi-judicial decision of the SPB.  As with *Loper*, Mooradian's brief fails to explain the relevance of *Center of Biological Diversity* to the issues on appeal.

prepared on December 27, 2019, and January 4, 2020, respectively. The SPB's 2019 Decision was adopted on January 16, 2020. A transcript of the hearing on remand was prepared November 5, 2021. The SPB's 2021 Decision was adopted on November 10, 2021. Thus, Mooradian's contention is not supported by the facts.

### E. *Quashing of Subpoenas.*

Mooradian contends "the ALJ improperly quashed various subpoenas that … Mooradian filed seeking other employees' [TECs]," and failed to give Mooradian "the opportunity to dispute the Motion to Quash." Again, Mooradian failed to cite to the record on appeal to support this contention. Mooradian's briefs on appeal fail to identify what subpoenas are at issue, to whom they were issued, and why, on a substantive level, Mooradian believes they should not have been quashed.[12] He provides no discussion of applicable procedures relating to issuance of subpoenas or of motions to quash and whether those procedures were complied with. "An appellate court is not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) Again, the point is forfeited on appeal. (See *City of Santa Maria*, *supra*, 211 Cal.App.4th at p. 287; *Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 162.)

## IV. Substantial Evidence.

Mooradian contends substantial evidence does not support the ALJ's determination that Mooradian engaged in intentional dishonesty. In support of his contention, Mooradian argues he "could have legitimately claimed much more than a

---

[12] Our review of the record demonstrates that, on October 3, 2019, Mooradian did issue subpoenas duces tecum for seven categories of documents. The following day, October 4, 2019, Caltrans moved to quash the subpoena. On October 16, 2019, the ALJ granted the motion to quash. In his order, the ALJ noted that Mooradian "did not oppose the Motion." Mooradian provides no citation to the record to demonstrate that he did oppose the motion. If he did not, then it was incumbent upon him to demonstrate, by citing to appropriate legal authority and relevant facts within the record, to show he was wrongfully denied such an opportunity.

$23.00 dinner as [he] never sought compensation for use of his personal vehicle during work time" because, as Mooradian testified, on average, he would use his personal vehicle to travel from his Fresno office to the Fresno office where Lambert worked—a distance of approximately four miles in one direction—and never sought reimbursement for his mileage. Mooradian argues "[t]his is the cornerstone to finding dishonest under the California Supreme Court's definition of honesty," citing *Gee v. State Personnel Board* (1970) 5 Cal.App.3d 713 (*Gee*) without further discussion or explanation. In *Gee*, the court considered whether the plaintiff in that case had engaged in "dishonesty" within the meaning of Government Code section 19572, subdivision (f). The court wrote, " 'Dishonesty' connotes a disposition to deceive. [Citation.] It ' "denotes an absence of integrity; a disposition to cheat, deceive, or defraud." ' " (*Gee*, at pp. 718–719.) We fail to appreciate how Mooradian's choice not to seek reimbursement for the above-stated mileage supports his contention that he did not engage in intentional dishonesty.

Mooradian also contends Lambert's e-mail in which he posed questions to Mooradian concerning his departure and return times was vague and ambiguous. Lambert first sent Mooradian an e-mail that read, in substance:

> "I am reviewing your TEC and I have some questions. You charged CT for four nights of lodging but only have receipts for three nights. Also, you charged for breakfast, lunch, and dinner on a visit to D10. If you leave at or before 6:00 a.m. and return at or after 7:00 p.m. you can charge breakfast and dinner but not lunch…. Please resubmit."

In response, Mooradian sent Lambert a revised TEC that omitted the extra night stay and one lunch charge. Lambert then sent Mooradian the e-mail that Mooradian contends was vague and ambiguous. It read, in pertinent part:

> "I am reviewing your revised TEC, and I have questions: [¶] … [¶] … On February 26, 2019, what time did you leave Fresno, and … [¶] … What time did you return on the same day, February 26?"

Mooradian replied: "Please see the requested information responded to in red in your email below." Mooradian put "6am" in response to the first query and "7pm" in response

27.

to the second query. In the context of these e-mails, it strains credibility to suggest, as Mooradian does, that he interpreted the second query as inquiring when Mooradian returned to his residence when, as the GPS records showed, he returned to his Fresno office at 2:14 p.m. on the day in question. Moreover, as noted *ante*, the ALJ made a credibility determination with regard to Mooradian's testimony on the issue, stating, in part: "It is difficult to believe that [Mooradian] thought that his return to the Fresno office on February 26, 2019, did not terminate his trip under the meal reimbursement policy…. [¶] Moreover, [Mooradian] only first questioned the policy's meaning at the hearing, after he was disciplined for claiming a dinner he was not entitled to." As the ALJ stated, Mooradian "was responsible for reviewing and approving" the TECs of his subordinates. If he was confused about meal reimbursement policies, he would have brought up the issue prior to submitting the subject TEC, when he was reviewing his subordinates' TECs. " 'The fact finder's determination of the veracity of a witness is final. [Citation.] Credibility determinations thus are subject to extremely deferential review.' " (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579.) We will not disturb this credibility finding.

Substantial evidence exists to support the finding of dishonesty. On February 28, 2019, Mooradian submitted the first TEC at issue that contained false information concerning the time of his return to Fresno on February 26, 2019. The return time he listed coincided with the time necessary to claim the meal expense. Upon reviewing Mooradian's first TEC, his supervisor raised questions about the TEC and reminded Mooradian, "If you leave at or before 6:00 am and return at or after 7:00 pm you can charge breakfast and dinner but not lunch." Thus, at a minimum, Mooradian was put on notice that he needed to conduct a closer review of his TEC. On March 4, 2019, Mooradian submitted the second TEC at issue, which contained the same false information. Upon being questioned by his supervisor again, Mooradian continued to assert that he returned from his work-related travel at 7:00 p.m. It was only after learning

28.

that GPS records demonstrated he returned from his travels at 2:14 p.m., that Mooradian attempted to submit yet a third TEC. This third TEC still represented his return time as 7:00 p.m. on the day in question but omitted his claim for reimbursement of the dinner expense.

At the 2019 hearings, Mooradian was asked the following questions and gave the following answers:

"Q. When you were filling out the expense reports that you believe that was when the trip ended is when you returned home that day?

"A. Yes.

[¶] … [¶]

"Q. Ever receive anyone telling you that when you leave for a trip at your home, that the trip doesn't end, it ends when you go to an office, not when you return back to your starting point?

"A. No, no clarifications on that.

[¶] … [¶]

"Q. When you filled out the form, the trip began at your home and ended at your home, correct?"

"A. Yes.

"Q. And you believe that was the proper definition of qualifying trip?

"A. Yes."

One reasonable inference the ALJ could draw from the above testimony is that Mooradian's decision to list his return time to Fresno on February 26, 2019, as 7:00 p.m. even though his actual return time was 2:14 p.m., was intentional and not merely a case of mistaken memory. According to Mooradian, he did so because that is how he interpreted Caltrans's travel policy. However, as mentioned, the ALJ determined Mooradian's testimony about his belief as to what the travel policy was with regard to returning from work-related travel was not credible—a determination by which we are

29.

bound. Thus, substantial evidence exists to demonstrate that Mooradian intentionally listed his return time as 7:00 p.m., but his reason for doing so was false.

Based on the foregoing, we conclude substantial evidence supports a finding of intentional dishonesty.

## V. The Discipline Imposed.

Mooradian contends the penalty imposed on him in this case was excessive and an abuse of discretion.

"The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. [Citations.] Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber*, *supra*, 18 Cal.3d at p. 404.)

Mooradian states that, prior to the incident, he had an "unblemished employment record."[13] Mooradian further states that, at the time "Mooradian submitted the TEC in question, he was dealing with major family issues, including a divorce as well as an adult son with mental and drug issues."[14] He quotes *Skelly* for the following proposition: "In considering whether such abuse [of discretion] occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[harm]

---

[13] The NOAA advised Mooradian that "[t]his is the first formal adverse action taken against you." (Italics omitted.) Likewise, as mentioned, the ALJ found Mooradian had no prior history of adverse employment actions.

[14] We are not unsympathetic to the fact that Mooradian was experiencing major family issues. However, Mooradian did not contend that he mistakenly listed his return time due to the family issues he was experiencing. As previously noted, there is evidence Mooradian intentionally listed his return time on February 26, 2019, as 7:00 p.m. because (according to him) he believed that to be consistent with Caltrans's travel reimbursement policies. We are not convinced that the family issues Mooradian was undergoing at the time is a mitigating factor in his favor.

to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly*, *supra*, 15 Cal.3d at p. 218.)

Among other things, the ALJ found the public service was harmed because Mooradian had eroded the trust of his supervisor by submitting false TECs and misleading his supervisor in response to related queries; Mooradian's behavior called into question his ability to review subordinates' TECs ethically and in compliance with Caltrans's policies; "the public may now have a legitimate concern that employees at Caltrans will abuse meal expense reimbursement policies for personal benefit"; and Mooradian's credibility as a supervisor has been damaged. The fact that Mooradian was a near 30-year employee was not a mitigating factor in the ALJ's view but, rather, "serves as a basis to find that [he] should have known better." Moreover, the ALJ viewed Mooradian's failure to accept and admit responsibility for his misconduct, his lack of remorse, and his argument that "he complied with his understanding of the [TEC] policy" "evidence[d] a strong likelihood of recurrence." The ALJ also rejected the notion that Mooradian was receiving disparate treatment compared to the treatment experienced by other Caltrans employees who submitted erroneous TECs. The ALJ determined the conduct of the other employees did not involve intentional dishonesty whereas Mooradian's conduct did.

Based on our review of the record, we cannot say the punishment imposed was an abuse of discretion

## VI.    Skelly Issues.

Mooradian contends his due process rights were violated because he requested a *Skelly* hearing within the time parameters set forth in the NOAA but was denied the hearing unless he waived his right to assert a due process violation on grounds the hearing would be delayed until after his punishment was imposed.

31.

Caltrans argues a *Skelly* hearing could not be scheduled prior to Mooradian's demotion because "his attorney at the time failed to respond to [Caltrans] to request it." Caltrans observes that Mooradian submitted a detailed letter responding to the NOAA on May 15, 2019 (i.e., the last day to request a *Skelly* hearing and the date upon which, at the close of business, Mooradian's demotion was to become effective), and argues this satisfied the dictates of *Skelly*. Caltrans also contends the due process waiver was a "viable alternative" and would have allowed the *Skelly* hearing to go forward, albeit after the effective date of his demotion. According to Caltrans, Mooradian's failure to go forward with the hearing, which was conditioned on his signing the due process waiver, "constituted a waiver of any right to backpay."

We believe Mooradian has the better argument.

Our review of Mooradian's *Skelly* claim is de novo. The relevant facts are not in conflict and the question presented is predominantly legal. (See *Thaxton*, *supra*, 5 Cal.App.5th at p. 692.) Mooradian bore the burden of demonstrating a *Skelly* violation. (See *Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 283.)

### A. Skelly *and Its Progeny.*

Under California law, nonprobationary civil service employees have "a property interest in the continuation of [their] employment which is protected by due process" under the Fourteenth Amendment to the U.S. Constitution and article I, sections 7 and 15 of the California Constitution. (*Skelly*, *supra*, 15 Cal.3d at pp. 206, 207; *Barber*, *supra*, 18 Cal.3d at p. 399.)

In *Skelly*, our Supreme Court considered whether a nonprobationary civil service employee was denied due process when, as a disciplinary measure, his employment with the State Department of Health Care Services (Department) was terminated without providing him preremoval procedural rights. (*Skelly*, *supra*, 15 Cal.3d at pp. 197, 205.) The high court determined the statutory procedures available to the employee at that time

"concerning the taking of punitive action against a permanent civil service employee do not fulfill minimum constitutional demands." (*Id*. at p. 215.) The court concluded due process did not require "a full trial-type evidentiary hearing prior to the initial taking of punitive action." (*Ibid*.) The court held: "As a minimum, these preremoval safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." (*Ibid*.) Moreover, an employer must provide the employee a reasonable amount of time to prepare his or her response. (See *Coburn v. State Personnel Bd.* (1978) 83 Cal.App.3d 801, 805–806.)

"What *Skelly* requires is unambiguous warning that matters have come to a head, coupled with an explicit notice to the employee that he or she now has the opportunity to engage the issue and present the reasons opposing such a disposition. Moreover, the opportunity to respond must come after the notice of intention to dismiss." (*Coleman v. Regents of University of California* (1979) 93 Cal.App.3d 521, 525–526, some italics omitted.) The due process requirements articulated in *Skelly* apply to all types of adverse action which is defined by statute "to include 'dismissal, demotion, suspension, or other disciplinary action.' " (*LaMarr v. Regents of University of California* (2024) 101 Cal.App.5th 671, 675, citing § 19570.)

### B.    *Analysis.*

On May 8, 2019, Caltrans caused the NOAA to be personally served on Mooradian. Among other things, the NOAA provided Mooradian with the following notice of his right to respond to the allegations against him:

> "In accordance with State Personnel Board Rule 52.6 (Skelly rule), you are entitled to at least five (5) working days within which to respond to this notice. You may respond to this Notice either orally or in writing.
>
> "If this Notice was served upon you in person, you have five (5) working days starting the day after the date of service of this Notice, to request an opportunity to respond to the Notice. The date of service of this

Notice is the date the Notice was given to you as ascertained by the enclosed Declaration of Service.

"If this Notice was served upon you by United States Postal Service Express Mail, you have two (2) working days after the date of service of the Notice, plus the immediately-following next five (5) working days, to request an opportunity to respond to this Notice. The date of service of this Notice is ascertained by the enclosed Declaration of Service.

"If you wish to respond to this Notice, you must contact Kathy Raja, Personnel Liaison, at (559) 445-5853 to make the necessary arrangements to do so. Regardless of the manner in which you respond to this Notice, your request to respond must be received by Ms. Raja no later than the close of business on the fifth of the five (5) working days as specified in the above applicable paragraph.

"You are entitled to a reasonable amount of State time to prepare your response to the charges. You are not entitled to a formal hearing with examination of witnesses at this stage of the proceedings. However, you may be represented by another in presenting your response. The appointing power may sustain, amend, modify, or revoke the adverse action in whole or in part."

On May 15, 2019, the last day to request a *Skelly* hearing under the NOAA, Mooradian's counsel hand delivered and e-mailed a detailed letter to Caltrans's District 6 headquarters directed to Kathy Raja. In it, Mooradian requested a *Skelly* hearing but also substantively responded to claims in the NOAA. On the first page of the letter, Mooradian's counsel wrote: "Mr. Mooradian intends to respond to the [NOAA]. Please consider my phone call Tuesday afternoon [to Raja] and this writing to constitute Mr. Mooradian's response to the [NOAA]. We request a Skelly hearing to respond to the Notice, to dispute its suggested findings and the adverse job action that is proposed." The letter continued: "We object to the commencement of any adverse employment action against Mr. Mooradian until after his Skelly hearing is conducted and decided. Moreover, we request an oral hearing at which Mr. Mooradian and his counsel may be present. [¶] Given the severe time constraint imposed on this process, our responses are not as comprehensive as we would desire; however, the averments and arguments here

34.

are sufficient to dispense with the charges and to allow Mr. Mooradian to return to his work unimpeded by any disciplinary action." Mooradian's counsel then set forth Mooradian's responses to charges leveled against him.

Because Mooradian's response to the NOAA and request for a *Skelly* hearing was not received by Caltrans until the very day Mooradian's demotion was to go into effect, Caltrans offered Mooradian the opportunity to have a *Skelly* hearing after the effective date of his demotion but only if he signed a "Release from Claim of Denial of Due Process." The Release read as follows:

> "On behalf of either Mr. Theodore Mooradian, whose representative I am; and/or I, _____, have requested a meeting with a representative of management (referred to as a 'Skelly/Coleman'), in order to explain why the … [NOAA], effective close of business May 15, 2019, should be withdrawn or modified. However, since the Skelly hearing will be held after, but not late than, May 28, 2019, 10 days after the actual effective date of the NOAA, at the request of, and for the convenience of, either Mr. Theodore Mooradian and/or myself, I/we agree I/we will make no future claim, motion, or appeal of denial of due process, either entirely or in part, as a result of the Skelly having been held after the actual effective date of the NOAA.

> "Additionally, nothing in this waiver constitutes an admission of guilt or wrong doing on my part and/or of Mr. Theodore Mooradian, and I/we agree and understand that whatever the results of the Skelly may be, the initial appeal timeframe pursuant to the NOAA remain unchanged."

Mooradian contends the ALJ and SPB "failed to properly find the waiver illegal, and ignored the fact the purported waiver defeated the purpose of the *Skelly* hearing"—to provide Mooradian with the right to a preremoval hearing.

In the 2019 Decision, the ALJ determined Mooradian "was provided with an opportunity, prior to the imposition of discipline, to respond to Caltrans, and he did so." "Because [Mooradian] was provided with an opportunity to respond to the [NOAA] prior to the effective date, and … waived his right to a pre-disciplinary *Skelly* hearing by failing to avail himself of the offered procedure"—i.e., a *Skelly* hearing after the effective

35.

date of his demotion—the ALJ determined there was no *Skelly* violation and dismissed the claim.

The NOAA advised Mooradian that he "may respond to this [NOAA] either orally or in writing." Consequently, it gave Mooradian the option of choosing either type of response. Mooradian's counsel did state that the letter and prior telephone call to Raja should be considered his response but in the very next sentence expressly requested a *Skelly* hearing.

It is notable that Raja e-mailed Mooradian's counsel earlier in the day on May 15, 2019, and wrote: "Per our conversation yesterday afternoon regarding the Appeal Rights for your client …, you have a Right to respond orally or in writing (Option A …) and/or file a written answer to the [SPB] (Option B …). [¶] Option A states you have 5 working days starting the day after the date of service of the NOAA…. You have until 5pm today, Wednesday May 15, 2019, to respond in writing or request a[n] oral hearing, whether it be by telephone or in person. Otherwise, a hearing can be scheduled after the effective date of Action … by signing [the aforementioned] waiver release form."

It is undisputed that Mooradian requested the *Skelly* hearing within the time frame required by the NOAA and the time frame set forth in Raja's e-mail. It is of no moment that Mooradian waited until the final day or even the final hours to request the *Skelly* hearing, or that Caltrans did not have sufficient time to schedule a *Skelly* hearing prior to the demotion becoming effective. Mooradian was led to believe that he had until 5:00 p.m. to request the *Skelly* hearing. Caltrans could have (1) written the NOAA such that it would have had sufficient time to schedule a *Skelly* hearing upon a timely request, simply by making the contemplated discipline effective several days or one week later (i.e., after May 15, 2019); or (2) postponed the effective date of the contemplated discipline for a short period of time to allow the *Skelly* hearing to proceed before the punishment was imposed. To the extent Caltrans had insufficient time to schedule a *Skelly* hearing upon a timely request by Mooradian, it was a problem of Caltrans's own making.

36.

Caltrans's reliance on *In the Matter of the Appeal by Armando D. Rivera* (1992) SPB Dec. No. 92–12 [1992 CA St. Personnel Bd. LEXIS 15] (*Rivera*) to suggest that the due process waiver was an appropriate alternative to simply providing Mooradian a *Skelly* hearing prior to the imposition of discipline is unavailing.

In *Rivera*, the appellant employee was provided notice that he would be rejected during probation from his position with the California Conservation Corp. (CCC). (*Rivera*, *supra*, SPB Dec. No. 92–12, at p. 1.)  Appellant's attorney was out of town when she learned of the pending dismissal, would not return in sufficient time to prepare for a *Skelly* hearing before the effective date of the rejection, and called the CCC's personnel department in an attempt to schedule for a later date but, initially, could not reach the chief of personnel services (Chief) who, apparently, had the authority to reschedule the date.  (*Id*. at pp. 1, 3.)  When appellant's attorney finally reached the Chief, she was informed that the hearing could be rescheduled to after the effective date of the rejection if appellant and his attorney "were willing to come to Sacramento (a distance of 280 miles) for the Skelly hearing." (*Id*. at p. 3.)  The attorney agreed but only if it could be held one week after the originally scheduled hearing "due to previously scheduled commitments." (*Ibid*.)  The Chief subsequently told the attorney that she considered the attorneys request to be "a waiver of her client's right to a Skelly hearing," and, as a result, the hearing was never held.  (*Ibid*.)

The administrative law judge in *Rivera*, whose proposed decision was adopted by the SPB, concluded that the hearing was improperly scheduled by the CCC because it was coordinated between the CCC and the appellant's wife rather than with the appellant's attorney.  (*Rivera*, *supra*, SPB Dec. No. 92–12, at p. 4.)  The administrative law judge wrote, "If it was a primary concern of [the CCC] to conduct the Skelly hearing before the … effective date [of the rejection], the effective date could have been changed" (*ibid*.)—an option that, similarly, could have been provided to accommodate Mooradian's timely request for a *Skelly* hearing.

37.

The administrative law judge in *Rivera* proposed another alternative, which Caltrans relies on, namely: "to allow the appellant to waive his right to have his *Skelly* hearing prior to the effective date, and proceed with his *Skelly* hearing after the effective date," a procedure the appellant's attorney agreed to. (*Rivera*, *supra*, SPB Dec. No. 92-12, at p. 4.) Here, in contrast, Mooradian and Mooradian's counsel did not agree to such a procedure and, instead, relied upon the NOAA and Raja's e-mail informing them that Mooradian had until 5:00 p.m. on May 15, 2019, to request the hearing, which they timely did.

In our opinion, it was unreasonable for Caltrans to provide Mooradian with five days to request a *Skelly* hearing and then, upon receiving a timely request for such a hearing, to offer the hearing only if Mooradian waived due process rights. Mooradian has sufficiently demonstrated his due process rights were violated by this practice.

## VII. Backpay.

Relying on *Barber*, Mooradian contends he is "entitled to backpay at his previous rate of pay from the date of demotion, May 15, 2019, until the October 5, 2021, hearing date." Caltrans argues *Barber* is inapposite because the facts are distinguishable but does not discuss how or why those differences should impact our decision. Caltrans also argues that, under *Mitchell v. State Personnel Board* (1979) 90 Cal.App.3d 808 (*Mitchell*), "backpay is cut off at the point the employee could have cured the due process violation." We are persuaded that Mooradian is entitled to backpay, as set forth below.

In *Barber*, the court found the disciplinary procedures used in that case were unconstitutional because discipline was imposed "prior to affording the employee notice of the reasons for the punitive action and an opportunity to respond." (*Barber*, *supra*, 18 Cal.3d at p. 403.) In considering the appropriate remedy for a violation of an employee's *Skelly* rights, the *Barber* court wrote, "[t]he remedy for the employee in these cases is to award back pay for the period of wrongful discipline. [Citations.] Thus, damages consist only of back pay for the period discipline was improperly imposed, i.e.,

from the date of actual discipline to the time discipline was validated by the hearing." (*Id*. at p. 402.) The high court continued: "This infirmity is not corrected until the employee has been given an opportunity to present his arguments to the authority *initially* imposing discipline. [Citation.] Under the procedures applied …, the constitutional vice existed until the time the [SPB] rendered its decision. Prior to that time, the discipline imposed was invalid." (*Id*. at p. 403.) "The proper period for measuring the amount of back pay due therefore begins at the time discipline is actually imposed and ends on the date the [SPB] files its decision." (*Ibid*.) We acknowledge the facts of *Barber* differ from those in the case before us but do not view those differences as material to the issue we now decide.

*Mitchell* involved a situation where a psychiatric technician, while carrying a mentally handicapped, paraplegic patient, dropped the patient and kicked him in the head after the patient urinated while being carried. (*Mitchell*, *supra*, 90 Cal.App.3d at p. 810.) Two days later, the technician was placed on leave of absence pursuant to statute. (*Ibid*.) After an investigation, the technician was notified of his dismissal and, among other things, his right to a *Skelly* hearing within five days. (*Id*. at p. 811.) The dismissal was made retroactive to the date he was placed on leave. (*Ibid*.) The technician did not request a *Skelly* hearing but did appeal his dismissal to the SPB. (*Ibid*.) In the decision adopted by the SPB, the administrative law judgment founding no due process violation under *Skelly* and "found the punitive action of dismissal proper." (*Ibid*.)

The technician then petitioned for a writ of mandate pursuant to Code of Civil Procedure section 1094.5 but only raised the *Skelly* issue as a basis for judicial intervention. (*Mitchell*, *supra*, 90 Cal.App.3d at p. 811.) The trial court found in favor of the technician and awarded him backpay from the date he was placed on leave through the date of the SPB's decision. (*Ibid*.)

On appeal, the SPB argued " 'extraordinary circumstances' " required it to promptly dismiss the technician "to avert harm to the public." (*Mitchell*, *supra*,

90 Cal.App.3d at p. 812.)  The *Mitchell* court concluded there was a valid basis upon which to place the technician on administrative leave but "[t]he forced leave removed any emergency which might have been presented by [the technician's] continued presence at the hospital." (*Id.* at p. 813.)  The court found no justification for "utilization of an emergency exception to the procedural requirements announced in *Skelly*." (*Ibid.*)  The court further found that, because the technician was offered a *Skelly* hearing that would have been conducted within five days of his dismissal date and refused that offer, he was only entitled to five days of backpay. (*Id.* at p. 814.)

The situation here differs from that in *Mitchell*.  In *Mitchell*, the offer to hold a *Skelly* hearing within five days of the technician's dismissal was not conditioned upon the technician waiving his right to claim a due process violation in connection with the delayed hearing.  Here, Caltrans would not provide the delayed hearing unless and until Mooradian waived his due process rights.

Consequently, we conclude Mooradian is entitled to backpay (utilizing his predemotion rate of pay) from the date of his demotion (i.e., May 15, 2019) to and including the date the SPB filed its 2021 Decision (i.e., November 20, 2021).

## DISPOSITION

The "Judgment – Peremptory Writ of Mandamus" entered on June 5, 2024, is reversed in part, and affirmed in part.  It is reversed to the extent it determined there was no *Skelly* violation and to the extent it determined no damages were due Mooradian as a result of the violation.  It is affirmed in all other respects.  The superior court is directed to enter a new judgment granting the petition for writ of mandate on the limited grounds set forth in the preceding sentence and remanding this matter to the State Personnel Board for the following limited purposes.  The superior court shall direct the State Personnel Board to conduct proceedings to determine the amount of backpay due Mooradian for the *Skelly* violation for the period May 15, 2019, through November 20, 2021, and to award it forthwith.

40.

In the interests of justice, Mooradian is awarded his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3) [award or denial of costs where a judgment is reversed in part].)

 

 

                                                        LEVY, Acting P. J.

WE CONCUR:


DETJEN, J.


PEÑA, J.